J43QMARh

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                         18 CR 303   (JMF)

                                      Hearing

GERMAN MARMOLEJOS,

          Defendant.

------------------------------x

                                New York, N.Y.
                                April 3, 2019
                                9:40 a.m.

Before:

                HON. JESSE M FURMAN,

                                District Judge

                      APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
MICHAEL K. KROUSE
DANIEL G. NESSIM
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
JENNIFER E. WILLIS
CHRISTOPHER FLOOD

-Also Present-

Mitsi Germain, Paralegal (Gov.)
Chiraayu Gosrani, Paralegal (Fed. Def.)
Erika de los Rios, Interpreter (Spanish)
Christina Weisz, Interpreter (Spanish)

1          (In open court; case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3    appearance for the record.

4          MR. NESSIM:  Good morning, your Honor.

5          Daniel Nessim and Michael Krouse for the government.

6    Joining us at counsel table is Mitsi Germain, a paralegal in

7    our office.

8          THE COURT:  Good morning.

9          MS. WILLIS:  Good morning, your Honor.

10         Jennifer Willis and Christopher Flood, Federal

11   Defenders of New York on behalf of Mr. Marmolejos.  And joining

12   us at counsel table is paralegal Chiraayu Gosrani.

13         THE COURT:  Good morning to you as well.

14         Good morning, Mr. Marmolejos.

15         THE DEFENDANT:  Good morning.

16         THE COURT:  We are joined by two Spanish language

17   interpreters.  Let me just confirm, Mr. Marmolejos, that you're

18   able to understand and that the headphones are working?

19         THE DEFENDANT:  Correct.

20         THE COURT:  If at any point during today's proceeding

21   you have any trouble understanding, please let me know so we

22   can take care of the problem right away.  Understood?

23         THE DEFENDANT:  Yes.

24         THE COURT:  We are here for a competency hearing.

25         Counsel, what is the order of operations, and how do

1    you propose that we proceed?  Am I correct that the government

2    plans to call one witness, two witnesses?

3            MR. NESSIM:  We plan to call two witnesses.  One we

4    expect to be very brief.

5            THE COURT:  I don't know if you've discussed with

6    defense counsel, but I think the law isn't entirely clear whose

7    burden it is.  Whether that ultimately matters or not is a

8    different question, but given that, I think there is some

9    discretion as to whether you put on your case first or they put

10   on their case.  Do you have a view on that?

11           MR. NESSIM:  We discussed this last night.  I think

12   it's technically the defendant's motion, but I agree there is

13   no burden on either party in this type of case, it seems.  So

14   we're happy to go first.

15           THE COURT:  I think there is a burden, just nobody

16   knows whose it is.  Very good.

17           Ms. Willis, what's your plan?  Do you plan to call

18   your expert witness?

19           MS. WILLIS:  I do plan to call him, your Honor.  And

20   as the government indicated, we did have a conversation last

21   night about who should go first and who would go first, and per

22   that conversation, my expectation was that the government was

23   going to proceed first.

24           Just as a housekeeping matter, I understand that there

25   are two experts being called, and the government is also

1    calling sort of a lay witness.  And I think there's a question

2    about whether the witnesses can stay in the room for the

3    hearing.  I certainly would request that my expert be allowed

4    to sit in the room since he, I believe, will be qualified to

5    opine in terms of the lay witness.  I don't think that would be

6    appropriate for the non-expert to see the proceedings until

7    they come in to testify.

8              THE COURT:  Mr. Nessim, what's the order of your

9    proposed witnesses?

10             MR. NESSIM:  We will be calling the law enforcement

11   witness first and then our expert.

12             THE COURT:  So I think that takes care of any issue

13   with respect to sitting in.  What is your position on the

14   defense witness attending?  I think certainly in the civil

15   context, it's certainly fair for a defense expert to sit

16   through the expert testimony of the plaintiff's expert, in

17   part, to be able to respond to it.  I wouldn't think there

18   would be any reason to do differently here.

19             MR. NESSIM:  That's fine, your Honor.

20             THE COURT:  Very good.

21             So are both sides ready to proceed?

22             MR. NESSIM:  Yes, your Honor.

23             MS. WILLIS:  Yes, your Honor.

24             THE COURT:  So, government, please call your first

25   witness.

1          MR. KROUSE:  Thank you, your Honor.

2          The government calls Special Agent David Gonzalez.

3    DAVID GONZALEZ,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. KROUSE:

8          THE DEPUTY CLERK:  Please state your full name and

9    spell it slowly for the record.

10          THE DEFENDANT:  Special Agent David, D-A-V-I-D.  Last

11    name Gonzalez, G-O-N-Z-A-L-E-Z.

12          THE COURT:  You may proceed.

13          MR. KROUSE:  Thank you, your Honor.

14    Q.  Special Agent Gonzalez, where do you currently work?

15    A.  I currently work with Homeland Security Investigations.

16    Q.  Is that known as HSI?

17    A.  It is HSI.

18    Q.  How long have I worked for HSI?

19    A.  Approximately 13 years.

20    Q.  What's your current title?

21    A.  Special Agent.

22    Q.  What group do you currently work for?

23    A.  I work with the undercover operations group with the

24    El Dorado Task Force.

25    Q.  What is the El Dorado Task Force?

1    A.   The El Dorado Task Force is a task force that investigates

2    primarily money laundering, bulk cash smuggling, and different

3    various narcotics investigations.

4    Q.   In the course of working on these narcotics and money

5    laundering cases, have you conducted post arrest interviews?

6    A.   Yes, I have.

7    Q.   Directing your attention to January 23, 2018, was an

8    individual named German Marmolejos arrested by your group?

9    A.   Yes, there was.

10   Q.   Were you present for the arrest?

11   A.   I was not present for the arrest.

12   Q.   Were you present when Mr. Marmolejos was processed back at

13   your office?

14   A.   Yes.

15   Q.   Do you see Mr. Marmolejos in the courtroom today?

16   A.   Yes, I do.

17   Q.   Can you identify him by where he's seated and by an item of

18   clothing that he is wearing?

19   A.   He's sitting at the last desk, a black jacket, I believe,

20   or black shirt with black headphones.

21            THE COURT:   Indicating the defendant.

22   Q.   On January 23, 2018, did you attempt to interview

23   Mr. Marmolejos?

24   A.   I did.

25   Q.   Did you try to interview him alone or with another person?

1    A.  No, there was another Special Agent, Michael Molina.

2    Q.  Before interviewing Mr. Marmolejos, did you and Special

3    Agent Molina read Mr. Marmolejos his Miranda rights?

4    A.  Yes, Special Agent Molina read them in the Spanish version.

5    Q.  Is there a form HSI uses to correctly advised of their

6    rights?

7    A.  Yes, we have a declaration of rights form.

8           MR. KROUSE:  Ms. Germain, can you put on the screen

9    for everyone what's been marked as Government Exhibit 1.

10   Q.  Do you recognize this document?

11   A.  I don't see it.  I see it now.  Yes, I recognize it.

12   Q.  What is it?

13   A.  That's the statement of rights form that we use in the

14   English version.

15          MR. KROUSE:  Your Honor, the government offers

16   Government Exhibit 1.

17          THE COURT:  Any objection?

18          MS. WILLIS:  No objection, your Honor.  One of the

19   screens is not working.  I don't know if it's just a matter

20   of-- I think it's good enough.  Thank you.

21          THE COURT:  Any objection to Government Exhibit 1?

22          MS. WILLIS:  The English version, no, your Honor.

23          THE COURT:  Admitted.

24          (Government's Exhibit 1 received in evidence)

25   Q.  Special Agent Gonzalez, is there a version of this form

1    translated into Spanish?

2    A.  Yes, there is.

3           MR. KROUSE:  Ms. Germain, can you put on the screen

4    for the witness or for everyone what's been marked as

5    Government Exhibit 1A.

6    Q.  Do you recognize this document?

7    A.  I do.  That's the declaration of rights in Spanish.

8           MR. KROUSE:  The government offers Government Exhibit

9    1A.

10          THE COURT:  Any objection?

11          MS. WILLIS:  No, your Honor.

12          THE COURT:  Admitted.

13          (Government's Exhibit 1A received in evidence)

14   Q.  Special Agent Gonzalez, when you tried to interview

15   Mr. Marmolejos, was he advised of his Miranda rights?

16   A.  Yes, he was.

17   Q.  Was one of these forms used to advise him of those rights?

18   A.  Yes, the form in the Spanish version.

19   Q.  Government Exhibit 1A?

20   A.  Correct.

21   Q.  Who advised Mr. Marmolejos of his rights, you or Molina?

22   A.  Special Agent Molina.

23   Q.  Were you present when Special Agent Molina advised

24   Mr. Marmolejos of his rights?

25   A.  I was.

1   Q.  Can you describe what you saw Special Agent Molina do in

2   order to advise Mr. Marmolejos of his rights?

3   A.  Before we attempted to interview Marmolejos, Special Agent

4   Molina read each line one by one to Mr. Marmolejos as

5   Mr. Marmolejos read along with him.

6   Q.  Special Agent Molina was speaking in Spanish at that time?

7   A.  That is correct.

8           THE COURT:  When you say "read along with him," what

9   do you mean?

10          THE WITNESS:  Mr. Marmolejos was at the same desk

11  where we were at, and Molina was sitting -- Special Agent

12  Molina was sitting next to him.  As he read along the

13  declaration of rights, Marmolejos read with him line by line.

14          THE COURT:  Did Mr. Marmolejos read them out loud or

15  just it was your observation --

16          THE WITNESS:  It was my observation he read them to

17  himself.

18          THE COURT:  OK.

19  Q.  And just to be clear, your observation was he was following

20  along?

21  A.  He was following along, correct.

22  Q.  Was Special Agent Molina reading out loud?

23  A.  Yes.

24  Q.  Now, after Special Agent Molina read these rights on

25  Government Exhibit 1A to Mr. Marmolejos, what, if anything, did

1  Mr. Marmolejos say or do?

2  A.  He -- from what I understood, he stated that he did not

3  want --

4          MS. WILLIS:  Objection.  I just want to be clear.  If

5  this witness does not speak Spanish, I don't believe he can

6  testify to what Mr. Marmolejos said, and his testimony is from

7  what he believes he said.

8          THE COURT:  All right.  Well, I think hearsay is

9  admissible in this hearing.  You can certainly cross-examine on

10  that, and it is I think a valid line of inquiry, but I'll

11  overrule the objection with that.  Go ahead.

12          MR. KROUSE:  Thank you, your Honor.

13  Q.  What did you observe Mr. Marmolejos say or do after he was

14  read his rights?

15  A.  He had a pen in his hand and he stated that he would not

16  sign the form, and he put the pen down, and he requested for an

17  attorney to be present.

18          THE COURT:  Just to confirm, do you speak Spanish?

19          THE WITNESS:  I understand Spanish.  I don't speak it

20  fluently, but I understand it enough to understand that that's

21  what Mr. Marmolejos was requesting.

22          THE COURT:  So you independently understood that --

23          THE WITNESS:  I did.  Yo quiero un abogado.  I'm

24  sorry, in Spanish, he stated more or less the terms yo, Y-O,

25  quiero un abogado.

1          THE COURT:  Can you translate as you understand it

2   into English?

3          THE WITNESS:  I want an attorney.

4          THE COURT:  And you understood that first hand,

5   correct?

6          THE WITNESS:  Correct, yes.

7   Q.  Special Agent Gonzalez, you testified earlier that you've

8   conducted many post arrest interviews in your job as a Special

9   Agent.  Is that right?

10  A.  That is correct.

11  Q.  Approximately how many post arrest interviews have you

12  conducted?

13  A.  Approximately a hundred.

14  Q.  Before you conducted those interviews, did you always

15  advise the defendant of his or her Miranda rights?

16  A.  Yes.

17  Q.  Based on your own observations, did it appear that

18  Mr. Marmolejos understood his rights as Special Agent Molina

19  was explaining them to him?

20  A.  Yes.

21          MS. WILLIS:  Objection.

22          THE COURT:  Sustained for lack of foundation.

23  Q.  Now, what cause -- now, Special Agent Gonzalez, when you

24  previously conducted post arrest interviews, did you ever have

25  an occasion where it appeared that a defendant did not

1   understand his or her Miranda rights?

2           MS. WILLIS:  Objection as to relevance.

3   A.  Yes.

4           THE COURT:  Overruled.

5   Q.  Can you explain what you observed of those defendants to

6   lead you to conclude that they did not understand their rights?

7   A.  I've had defendants ask questions while I've read them the

8   rights specifically stating to explain certain terms or

9   different lines that they might not have understood.

10  Q.  Now, when Mr. -- when Special Agent Molina was reading the

11  rights to Mr. Marmolejos, what did you observe?

12  A.  I did not observe any questioning regarding to any of the

13  wording in the form of the special -- of the declaration of

14  rights.

15  Q.  After the rights were read to Mr. Marmolejos, what exactly

16  again did he say to Special Agent Molina and to you?

17  A.  He threw down the pen that he had in his hand and more or

18  less he said, yo quiero un abogado, which is "I would like an

19  attorney" in Spanish.

20          MR. KROUSE:  No further questions, your Honor.

21          THE COURT:  Cross-examination.

22          MS. WILLIS:  Thank you, your Honor.

23  CROSS-EXAMINATION

24  BY MS. WILLIS:

25  Q.  Special Agent, you indicated you are not a native Spanish

1   speaker?

2   A.   I am not a native Spanish speaker.

3   Q.   And it was your partner who was reading the rights to

4   Mr. Marmolejos?

5   A.   Yes.

6   Q.   Not you?

7   A.   Not me.

8   Q.   You said that -- your observation was that Mr. Marmolejos

9   was sitting next to your partner?

10  A.   Yes.

11  Q.   And you saw him sort of looking at the page that your

12  partner was looking at?

13  A.   Yes.

14  Q.   Correct?  He wasn't saying any words out loud?

15  A.   He was not.

16  Q.   He wasn't sort of moving his mouth as if sort of reading

17  silently?

18  A.   I don't remember.

19  Q.   You don't remember if that happened?

20  A.   I do not remember if he was moving his mouth or not.

21  Q.   You said initially that at the end of this reading of the

22  Spanish rights from 1A, initially you said that Mr. Marmolejos

23  placed down the pen and said, "I'm not going to sign anything."

24  A.   OK.

25  Q.   That's a yes, that you just testified to that?

1    A.  Per -- I don't remember.

2    Q.  You don't remember --

3    A.  I don't remember what I said initially.

4    Q.  You don't remember --

5    A.  Can you repeat it again?

6    Q.  OK.

7    A.  Mmm-hmm.

8            THE COURT:  Hold on.  Let's make sure -- only one

9    person can speak at a time --

10           THE WITNESS:  Sorry, your Honor.

11           THE COURT:  -- so if I'm speaking or Ms. Willis is

12   speaking, just make sure you wait until we're done, and you can

13   answer and vice versa.

14   A.  Sorry, Ms. Willis.

15   Q.  Sure.

16           Ten minutes ago when the government was asking you

17   questions, the first time they asked you about the reading of

18   the rights to Mr. Marmolejos in Spanish from Government Exhibit

19   1A that you saw on your screen, OK, that's the point in time

20   I'm asking about, OK?

21   A.  OK.

22   Q.  You said that after the declaration of rights was read,

23   that Mr. Marmolejos placed the pen down and said, "I'm not

24   going to sign anything."

25   A.  Yes.

1    Q.  That's what you just told us, correct?

2    A.  Yes.

3    Q.  OK.  There is a Department of Homeland Security report of

4    investigation that was done, a written report --

5    A.  Correct.

6    Q.  -- in this case?

7    A.  Yes.

8    Q.  And it details the arrest and the attempts to interview

9    Mr. Marmolejos and his co-defendant?

10   A.  Yes.

11   Q.  And nowhere in that form does it say that Mr. Marmolejos

12   was ever holding a pen.

13   A.  OK.

14   Q.  Yes?

15   A.  The report of investigation is what you're asking?

16   Q.  I'm asking you about the report of investigation in this

17   case.

18   A.  I did not write that report of investigation, so I don't

19   remember.  I've read it during the time of the arrest more or

20   less around January or February, but I do not remember exactly

21   what the report of investigation states.

22   Q.  You didn't write a report in this case?

23   A.  I did not.

24   Q.  And these events took place over a year ago in January of

25   2018?

1    A.  Correct.

2    Q.  Correct?  OK.

3            And you reviewed the report of investigations as part

4    of your preparation to testify in this case?

5    A.  Correct.

6    Q.  As part of your further preparation to testify in this

7    case, you were interviewed by U.S. Attorneys on April 1?

8    A.  Yes.

9    Q.  And the purpose of that was to sort of just prepare you for

10   what questions might be asked and get you ready to testify?

11   A.  Yes.

12   Q.  And in the course of that interview, you told them the

13   things that you could remember about January 23?

14   A.  Yes.

15   Q.  You told them that you might have helped process

16   Mr. Marmolejos, but you weren't sure?

17   A.  Correct.

18   Q.  You might have fingerprinted him, but you weren't sure?

19   A.  Correct.

20   Q.  And in speaking to them, when you were describing what

21   happened after this reading of the rights in Spanish, you only

22   said that Marmolejos just asked to speak to a lawyer?

23   A.  Yes.

24   Q.  You never said anything to them about he was holding a pen.

25   A.  No.

1    Q.  Right?

2            You never said anything to them about he threw down

3    the pen?

4    A.  No.

5    Q.  You never said anything to them about he said, "I'm not

6    signing anything."

7    A.  No.

8            MS. WILLIS:  One moment, your Honor.

9            (Pause)

10   Q.  The government also asked you some questions about other

11   occasions in which you personally have read the advice of

12   rights form to suspects?

13   A.  Yes.

14   Q.  And they asked about your observations about whether people

15   understood or didn't understand the rights?

16   A.  Yes.

17   Q.  You are not a psychiatrist?

18   A.  I am not.

19   Q.  You are not a psychologist?

20   A.  I am not.

21   Q.  You are not trained in detecting cognitive deficits?

22   A.  I am not.

23   Q.  You are not trained in detecting mental health issues?

24   A.  No.

25           MS. WILLIS:  I have no further questions, your Honor.

1            THE COURT:  Any redirect?

2            MR. KROUSE:  Briefly, your Honor.

3    REDIRECT EXAMINATION

4            MR. KROUSE:  May I approach the witness, your Honor?

5            THE COURT:  You may.

6    BY MR. KROUSE:

7    Q.  I'm handing you what's been known as 3502A.  What is that

8    document?

9    A.  This is the report of investigation, also known as an ROI.

10   Q.  That's the report of investigation that Ms. Willis was

11   asking you about during the cross-examination?

12   A.  Yes.

13           MR. KROUSE:  The government offers 3502A.

14           THE COURT:  Any objection?

15           MS. WILLIS:  No objection, your Honor.

16           THE COURT:  Admitted.

17           (Government's Exhibit 3502A received in evidence)

18   Q.  If you could go to the page, I believe it's marked as GM-11

19   on the bottom?

20   A.  OK.

21   Q.  Could you read the paragraph that discusses the attempt to

22   interview Mr. Marmolejos?

23           MS. WILLIS:  I'm going to object, your Honor.  This is

24   not responsive to the cross-examination on this point.

25           THE COURT:  In any event, it's in evidence, and it

1     speaks for itself so we can leave it there.

2                MR. KROUSE:  Your Honor has a copy of it on the

3     screen.

4                THE COURT:  Yes.

5                MR. KROUSE:  No further questions.

6                THE COURT:  All right.  I assume no recross?

7                MS. WILLIS:  That's correct, your Honor.

8                THE COURT:  Special Agent Gonzalez, you may step down.

9                THE WITNESS:  Thank you, your Honor.

10                (Witness excused)

11                MR. NESSIM:  The government calls Dr. Ziv Cohen.

12      ZIV COHEN,

13           called as a witness by the Government,

14           having been duly sworn, testified as follows:

15      DIRECT EXAMINATION

16      BY MR. NESSIM:

17                THE DEPUTY CLERK:  Please state your full name and

18      spell it slowly for the record.

19                THE WITNESS:  My name is Ziv, Z like zebra, I like

20      India, V like Victor.  Cohen, C like Charlie, O like orange, H

21      like Henry, E like Edward, N like Nancy.  Ziv Cohen.

22                THE COURT:  You may proceed, Mr. Nessim.

23      Q.  Good morning, Dr. Cohen.

24      A.  Good morning.

25      Q.  What do you for a living?

1    A.  I am a psychiatrist.

2    Q.  How long have you been a psychiatrist?

3    A.  I've been a board certified psychiatrist since 2008.

4    Q.  Are you licensed to practice psychiatry?

5    A.  I am a licensed physician in the State of New York and a

6    board certified psychiatrist.

7    Q.  Where do you practice?

8    A.  I have a private practice in midtown Manhattan.

9    Q.  What is your practice composed of?

10   A.  My practice is a general psychiatry practice.  I treat the

11   full range of mental disorders in individuals 13 and up, and I

12   also have a forensic practice.

13   Q.  How long have you had a forensic practice?

14   A.  Since 2012.

15          THE COURT:  Just to be clear, what do you mean by a

16   forensic practice?

17          THE WITNESS:  So, in addition to treating patients, I

18   do evaluations for legal proceedings.

19   Q.  So, generally speaking, what is forensic psychiatry?

20   A.  Forensic psychiatry differs from general psychiatry in the

21   sense that a forensic evaluation is a mental health assessment

22   that is done for legal proceedings rather than for treatment

23   purposes.  The purpose of a forensic assessment is to apply

24   medical knowledge to help the legal system resolve disputes or

25   answer legal questions.

1   Q.  What is your educational background?

2   A.  I am a psychiatrist.  So I attended undergraduate degree at

3   Goucher College in Baltimore, Maryland where I studied biology

4   and chemistry; then completed my medical degree at the Albert

5   Einstein College of Medicine in New York.

6           Following my medical degree, I completed a residency

7   specialty training in psychiatry at New York Presbyterian

8   Hospital at Weill Cornell Medical Center.

9           I then worked as a military psychiatrist and as a

10  psychiatrist on the faculty at Weill Cornell Medical Center on

11  the inpatient unit there.

12          And following that work experience, I completed

13  specialty training in forensic psychiatry which included two

14  fellowships in forensic psychiatry which were both completed at

15  Columbia University here in New York.

16  Q.  And have you published any papers in the field of forensic

17  psychiatry?

18  A.  Yes, I have.

19  Q.  Approximately how many?

20  A.  Approximately five.

21  Q.  Have you ever been invited to speak on forensic psychiatry?

22  A.  Yes, I have.

23  Q.  Approximately how many times?

24  A.  I think about 20 times.

25  Q.  And you mentioned you're on the faculty at Weill Cornell?

1    A.   Yes.

2    Q.   Have you taught forensic psychiatry?

3    A.   Yes.  I am a clinical assistant professor of psychiatry at

4    Weill Cornell Medical College, and I'm the director of forensic

5    curriculum there, which means that the general psychiatry

6    residents receive a forensic psychiatry education as part of

7    their training, and I am in charge of that curriculum.  I

8    deliver most of the lectures across their four-year curriculum,

9    and I also coordinate the other guest lectures that come.

10           In addition, I have a forensic elective that I do with

11   psychiatry residents in the department where I specifically go

12   over cases with them and do some cases with them for their

13   training.

14           I am also on the faculty at Columbia University, and I

15   teach in their forensic psychiatry fellowship where I had

16   trained.  I supervise the forensic psychiatry fellows there,

17   and I do teaching cases with them as well.

18   Q.   Are you a member of any professional organizations?

19   A.   Yes, I am.

20   Q.   Which ones?

21   A.   I'm a member of the American Medical Association.  I've

22   also been elected a fellow of the American Psychiatric

23   Association.  I am a member of the American Academy of

24   Psychiatry and the Law, which is the professional organization

25   of forensic psychiatrists.  I am also the former president of

1   the New York Chapter of the American Academy of Psychiatry and

2   the Law.  I am a member of the American Academy of Forensic

3   Sciences, which is the wider professional body of forensic

4   professionals.  And I'm a member of the American Society

5   Adolescent Psychiatry and also the former president nationally

6   of the American Society of Adolescent Psychiatry.

7   Q.  Have you testified as an expert witness in forensic

8   psychiatry before?

9   A.  Yes, I have.

10  Q.  Approximately how many times?

11  A.  About half a dozen times.

12  Q.  In which courts?

13  A.  I've testified in state and federal court, in New York

14  State Supreme Court, in a number of different counties in New

15  York State family court, and in federal court in the Eastern

16  District of New York, and in the Western District of North

17  Carolina.

18  Q.  Have you performed competency evaluations of defendants

19  before?

20  A.  Yes, I have.

21  Q.  Approximately how many times?

22  A.  Many times.  I think too many to count, but if I had to

23  estimate, more than a hundred.

24  Q.  Have you ever been appointed by the court to perform those

25  evaluations?

1    A.  Yes, I have.

2    Q.  Have you ever been retained by the government to perform

3    those evaluations?

4    A.  Yes, I have.

5    Q.  Have you ever been retained by the defense to perform those

6    evaluations?

7    A.  Yes.

8    Q.  Have you ever found a defendant incompetent to stand trial?

9    A.  Yes.

10   Q.  Approximately how many times?

11   A.  I would also say too many to count.  Often the forensic

12   evaluations that I do are particularly complicated cases, so

13   it's not unusual for me to find somebody not competent to stand

14   trial.

15           MR. NESSIM:  Your Honor, at this time the government

16   moves to qualify Dr. Cohen as an expert in the field of

17   forensic psychiatry.

18           THE COURT:  Any objection?

19           MS. WILLIS:  No, your Honor.

20           THE COURT:  He is so received.

21   BY MR. NESSIM:

22   Q.  Dr. Cohen, what proportion of your work involves forensic

23   analysis?

24   A.  It varies from time to time, but I would say on average

25   about 20 percent of my professional time is allocated to

1    forensic work.  The majority of the rest of my time is to

2    patient care, and then some additional time is devoted to

3    teaching.

4    Q.  Can you explain generally how you conduct a forensic

5    assessment of an individual?

6    A.  Yes.  So a forensic assessment involves doing a thorough

7    psychiatric assessment, a direct examination of the individual

8    being evaluated.  But in addition to that, it involves

9    gathering records on that person, particularly prior treatment

10   records, but any other records that can help shed light on the

11   individual over time, and it also involves attempting to speak

12   with collateral sources who also have known that individual

13   over time and can shed more light on that person's behavior in

14   a variety of contexts because that is an important element in a

15   forensic assessment is understanding the individual in a global

16   manner.

17   Q.  And why is that particularly important in forensic

18   psychiatry?

19   A.  In forensic psychiatry we're tasked with answering a

20   specific question that's posed to us by the legal system, and

21   so in answering that question the data that's generated during

22   the interview is important, but we need to compare that data to

23   other data that's available about that individual's

24   functioning.  So in forensic psychiatry, if we relied only on

25   the interview, we would have an incomplete picture of the

1    person's functioning in a variety of contexts in their life.

2    Q.  Focusing on competency evaluations, what do you understand

3    your role to be in conducting such an evaluation?

4    A.  Can you clarify the question?

5    Q.  So in the competency context, what sort of questions are

6    you considering in that context?

7    A.   In a competency evaluation, I am tasked with understanding

8    whether there is some kind of an impairment which prevents the

9    individual from being competent to stand trial, and there are a

10   number of elements that relate to competence to stand trial

11   that have to be looked at in that regard.

12   Q.  What is your understanding of what it means to be competent

13   to stand trial?

14   A.   So, competence to stand trial relates to an individual

15   understanding what the charges are against him or her,

16   including the seriousness of the charges and the consequences.

17   It relates to the individual understanding the basic

18   functioning of the legal system and the court process,

19   including the roles of the chief actors, the judge, defense

20   attorney, prosecutor, a jury if it's relevant, and finally it

21   involves the individual being able to assist his or her

22   attorney in their defense.

23   Q.  Are you familiar with the term malingering?

24   A.  Yes.

25   Q.  What does it mean?

A.  Malingering is a psychiatric term that refers to the

intentional production or exaggeration of symptoms, and it

refers to an individual producing or exaggerating symptoms with

a particular aim to benefit from being designated as being

considered ill.  So it's a behavior that involves production of

symptoms, and there's a sense that there will be a benefit from

being deemed ill.

Q.  When conducting a competency evaluation, what, if any,

determinations are you required to make about whether a patient

is malingering?

A.  It's very important, especially -- I mean, any legal

proceeding, but particularly in the criminal setting the stakes

be quite high for the defendant, and so there may be a variety

of pressures on the individual that may lead them to produce or

exaggerate symptoms, so it's very important to consider

malingering and to do an in-depth inquiry to rule it in or out.

Q.  What factors would lead you to conclude that a patient is

malingering?

A.  So there would be a variety of factors, and I would not try

to give a comprehensive list now, but I think the general idea

is that if an individual is presenting with symptoms that is

not consistent with a psychiatric or medical condition or is

not consistent with other information that we have about that

person, then one certainly needs to consider the possibility of

production or feigning of symptoms.

1    Q.  In the course of your work as a forensic psychiatrist, did

2    you conduct a forensic evaluation of German Marmolejos, the

3    defendant in this case?

4    A.  Yes, I did.

5    Q.  Did you prepare a report in connection with your

6    examination of the defendant?

7    A.  Yes, I did.

8             MR. NESSIM:  Your Honor, may I approach the witness?

9             THE COURT:  You may.

10   Q.  I'm handing you what's been marked for identification as

11   Government Exhibit 2.  What is that document?

12   A.  This is my report, my forensic psychiatric competency

13   report on German Marmolejos.

14   Q.  Directing your attention to the last page, is that your

15   signature?

16   A.  Yes, it is.

17   Q.  Would this report assist you in your testimony today?

18   A.  Yes, it would.

19            MR. NESSIM:  Your Honor, the government offers

20   Government Exhibit 2 into evidence.

21            THE COURT:  Any objection?

22            MS. WILLIS:  No objection.  And no objection to the

23   expert referring to his report.

24            THE COURT:  Admitted.

25            (Government's Exhibit 2 received in evidence)

1    Q.  Dr. Cohen, what prompted your evaluation of Mr. Marmolejos?

2    A.  I was appointed by the court to conduct a competency

3    evaluation of German Marmolejos.

4    Q.  Where did you conduct your evaluation of the defendant?

5    A.  It was conducted in my office.

6    Q.  How many times did you meet with the defendant?

7    A.  I met with him on two occasions.

8    Q.  On what dates?

9    A.  The initial meeting was on October 19 of 2018, and the

10   second meeting was on December 17 of 2018.

11   Q.  How long was each meeting?

12   A.  Each meeting was two hours long.

13   Q.  Do you typically meet with patients more than once when

14   performing competency evaluations?

15   A.  I do.

16   Q.  Would you say that you met with the defendant a typical

17   amount of time for a competency evaluation?

18   A.  I would say I spent somewhat more time with this defendant

19   than I typically do.

20   Q.  And why was that?

21   A.  I found him difficult to interview and uncooperative with

22   the interview, and felt that it was necessary to spend an

23   extensive amount of time with him to try to understand better

24   whether there was an impairment and to investigate in-depth

25   issues of competency.

1   Q.  Did you have sufficient time to evaluate Mr. Marmolejos?

2   A.  I did.

3   Q.  You mentioned when you perform a forensic evaluation, you

4   try to learn as much about a patient before conducting the

5   evaluation.  What sort of records did you review in advance of

6   your evaluations of Mr. Marmolejos?

7   A.  I reviewed the psychiatric record for Mr. Marmolejos, which

8   included his examination by his private psychiatrist,

9   Dr. Arroyo.  Also that included a letter that had been written

10  by his psychiatrist to his legal team and a letter that had

11  been written by his counselor, Felix Rodriguez to his legal

12  team.

13          I also reviewed psychological forensic psychological

14  report that had been prepared by a psychologist, Edward

15  Fernandez and the addendum to that report which addressed

16  issues of competency.

17          I also reviewed legal documents.  Those included the

18  complaint against Mr. Marmolejos and the indictment, the report

19  of the investigation by the Department of Homeland Security, a

20  mitigation letter which was submitted by defense counsel and,

21  of course, the order appointing myself in this matter.

22  Q.  Did you conduct any collateral interviews?

23  A.  I did.

24  Q.  With who?

25  A.  I spoke with two family members of Mr. Marmolejos.  I also

1    spoke with his girlfriend, and I also spoke with a social

2    worker who has been extensively involved with Mr. Marmolejos

3    with regard to his employment.

4              THE COURT:  And I take it the complete record of all

5    of those sources and the dates on which you conducted those

6    interviews, is that on page 2 of your report?

7              THE WITNESS:  That is correct.

8    Q.  Before you met with Mr. Marmolejos, were you aware of his

9    psychiatric history?

10   A.  I was.

11   Q.  Before you met with him, did you understand him to have

12   been diagnosed with any medical or psychiatric condition that

13   might impact his competency to stand trial?

14   A.  I was.

15   Q.  What are those conditions?

16   A.  So, his diagnosis had been made by Dr. Arroyo, his personal

17   psychiatrist, and that had been laid out in the record provided

18   to me -- the record of his treatment with Dr. Arroyo; and in

19   that examination Dr. Arroyo opined that Mr. Marmolejos meets

20   the diagnostic criteria for schizophrenia as well as for PTSD,

21   posttraumatic stress disorder.

22   Q.  Was there a mention of intellectual disability in those

23   reports?

24   A.  I believe those reports pointed out that he had limited

25   intellectual functioning.  I would have to refer to them again

1    specifically.  I don't believe they made a formal diagnosis of

2    intellectual disability.  I believe the formal diagnoses in

3    those reports were schizophrenia and posttraumatic stress

4    disorder, and that in the narrative of the report it was stated

5    that he had limited intellectual functioning.

6    Q.   So taking intellectual functioning, how does a psychiatrist

7    assess an individual's intellectual functioning?

8    A.   Intellectual functioning is a complicated three-dimensional

9    aspect of a person's functioning, and there are different

10   approaches to looking at it.  Of course I think most people are

11   familiar with cognitive testing, and that is a component of

12   assessing intellectual functioning, and there are a number of

13   cognitive tests that can be done to assess intellectual

14   functioning, but cognitive tests alone are not sufficient to

15   establish a person's level of intellectual functioning.

16          It is very important to look at their overall adaptive

17   functioning so that is a really critical component of overall

18   intellectual functioning because someone may not do well on a

19   paper-and-pencil test and yet have a high degree of functioning

20   in their daily life, and, therefore, it is part of the

21   diagnostic criteria in the DSM of intellectual disability to

22   look at adaptive functioning.

23          So it's comparing -- it's really looking globally at

24   narrow cognitive functioning as you would see on a

25   paper-and-pencil test but also looking broadly at the person's

1    adaptive functioning and making an assessment based on all of

2    that available information.

3         THE COURT:  Can you just define what you mean by

4    intellectual disability?

5         THE WITNESS:  Sure.  Intellectual disability refers to

6    a person having an impairment in their cognitive abilities, and

7    that would be reflected in multiple domains of functioning.  So

8    it can't just be reflected in a narrow area.

9         For example, someone who has difficulty reading alone

10   would not be considered to have an intellectual disability.

11   Intellectual disability is the more modern term for what used

12   to be called mental retardation.  To meet the criteria for what

13   used to be called mental retardation, or in DSM V has been

14   called intellectual disability, you have to have an impairment

15   in more than one domain of functioning.  So that may be a

16   person who would have difficulty in certain cognitive tasks but

17   also that would be reflected in an inability to perform the

18   normal functions of daily living.

19   Q.  And you mentioned schizophrenia and PTSD.  Can you briefly

20   describe those conditions?

21   A.  Sure.  Schizophrenia is a condition that's characterized by

22   psychosis.  Psychosis is broadly defined with having a break

23   with reality, and it's usually seen to have two components:

24   One would be hallucinations, hearing things, seeing things that

25   aren't there.  That could be evidence of a break with reality.

1    And the other would be having delusions.  So, fixed false

2    beliefs or having very disorganized thinking.  Those could also

3    be evidence of psychosis.  And that's what characterizes

4    schizophrenia.  And schizophrenia is a permanent condition,

5    once you develop it, you always have it.  So that's

6    schizophrenia.

7           PTSD is posttraumatic stress disorder.  That's a

8    condition that a person may develop after being exposed to

9    severe life-threatening trauma.  And that condition can be

10   characterized by a number of symptoms including things like

11   being on edge, having anxiety, depression, avoiding certain

12   activities, having intrusive memories of the trauma that you

13   can't stop thinking about, and that condition can be limited.

14   In time it can resolve and it be fully cured or it can be

15   chronic in nature.

16   Q.  How, if at all, did the fact that the defendant might have

17   been suffering from some of these symptoms or these conditions

18   affect your evaluation?

19   A.  It was very important to my evaluation because, in

20   particular, psychosis may impair somebody's ability to be

21   competent to stand trial.  It would be unusual and very rare

22   for PTSD to affect your competency to stand trial, but

23   certainly a psychotic illness -- were the defendant to have a

24   psychotic illness, that would be an important area to

25   investigate and to understand whether it was impairing

1    competence to stand trial.

2         Psychosis is in and of itself not synonymous with

3    being incompetent.  Most people with psychosis or schizophrenia

4    are competent to stand trial, but as it is something that may

5    impair competence, it would need to be something that would

6    have to be investigated in more detail.

7    Q.  What about intellectual disability, would that necessarily

8    make a person incompetent to stand trial?

9    A.  No, it would not.

10   Q.  You mentioned a few minutes ago that you met with

11   Mr. Marmolejos twice.  How did he present during those

12   meetings?

13   A.  He presented as a well-groomed young man.  He arrived early

14   to the appointments.  He waited calmly in the waiting room.

15   When I indicated it was time to come into the consultation

16   room, he promptly came into the room, sat down on the sofa and

17   was generally calm throughout the interview.

18        What was striking during the interview was that he was

19   highly non-verbal.  He did not make any spontaneous

20   communications or hardly any spontaneous communications and

21   tended to not answer questions that were posed to him.

22   Q.  What did the lack of spontaneous communications indicate to

23   you?

24   A.  Well, I thought it was highly unusual.  I have evaluated

25   thousands of patients and done many, many forensic evaluations

1   of individuals with the whole gamut of psychiatric illnesses,

2   and it's very unusual for someone to not make any spontaneous

3   communications.  You can have very impaired individuals who may

4   make spontaneous communications that don't make sense or are

5   off topic but more often than not they are going to make some

6   type of spontaneous communication, so it was striking to me.

7            THE COURT:  By "spontaneous communication," you mean

8   something unprompted, just some sort of communication from him

9   without a question being posed or the like?

10           THE WITNESS:  Certainly so, and I would also include

11  that if I ask him a question, that he would answer it in some

12  detail and offer some information beyond what I asked him.  So

13  that in a psychiatric interview – which is maybe in that regard

14  different from an legal interview where the answers are

15  somewhat narrow to the question being posed – in a psychiatric

16  interview, usually when you ask a person a question, they will

17  answer your question and they will speak a little bit more at

18  length, even if it is just a few more sentences, so that I

19  would consider that a spontaneous communication.

20           Whereas Mr. Marmolejos was extremely terse; generally

21  didn't answer the question.  It had to be rephrased multiple

22  times, and then when he did, he would answer it literally with

23  a one or two-word answer.  So I found that to be lacking in any

24  spontaneity.

25  Q.  What did his manner of answering questions indicate to you?

1    A.  It strongly indicated to me - particularly as I had the

2    chance to spend more time with him and compare his behavior in

3    my interview with interactions that he has outside of my

4    consultation room - it strongly indicated to me that he was

5    being non-cooperative with the interview.

6    Q.  Did you ask the defendant any questions about his basic

7    surroundings?

8    A.  Yes, I did.

9    Q.  What sort of questions did you ask?

10   A.  I asked him basic orientation questions to understand

11   whether he was oriented to person, time and place; and on

12   extensive attempts to gather that information from him -- well,

13   I would say a few things about that.

14        In contrast to questions about his personal history,

15   he was not willing to answer.  So most of the questions during

16   the interview he refused to answer, but questions about

17   orientation he did answer but he answered them strikingly

18   incorrectly.

19        So, for example, even asking him whether it was day or

20   night.  I mean, he didn't know the year.  He didn't know, you

21   know, the day of the week or month.  But even asking him

22   whether it was day or night, he indicated that he did not know,

23   and then later he indicated that he thought it was nighttime

24   even though it was clearly broad daylight.  There is a very

25   large window in my office, and there was a lot of sunlight that

1    was pouring in through the window.  Nevertheless, he indicated

2    that he thought it was the middle of the night.

3    Q.  In your experience, are individuals suffering from mental

4    illness unable to tell whether it was night or day?

5    A.  No, that would not be consistent with mental illness at

6    all.  So, no.

7    Q.  And you mentioned oriented to place, time and person.  What

8    does that mean?

9    A.  So orientation to place is where you are, what building

10   you're in, what street you're on, or even being able to say

11   "this is a doctor's office," for example, that's place.

12            A person is who are you talking to.

13            And time would be time of day, day of the week, the

14   year and so forth.

15   Q.  What, if anything, did you ask the defendant about his

16   legal case?

17   A.  I asked him questions related to the charges against him,

18   his arrest, his work with his defense attorney, what he

19   understood about the legal process.  So broadly questions

20   related to his experience so far with the legal system and also

21   with regard to his understanding of the legal system.

22   Q.  How did he respond to those questions?

23   A.  He generally did not answer those questions.  He would just

24   sort of stare at the floor or look away or kind of stare at me

25   intently for awhile, or he would say "I don't know" or "I don't

1   remember."

2   Q.   What did those responses indicate to you?

3   A.   Well, I found those responses inconsistent with his

4   behavior elsewhere.  He had had an interview with the

5   psychologist who had evaluated him previously, and he did

6   remember those things when he was talking to his psychologist:

7   He remembered he had been arrested.  He knew he had a defense

8   attorney.  He knew the name of the defense attorney.  So I

9   found that strikingly inconsistent.  And I also found it -- I

10  also found it implausible based on what I knew of him

11  psychiatrically because I could not find a mental health reason

12  that he wouldn't be able to answer those questions.

13  Q.   What do you mean by that?

14  A.   So, one would need to have an impairment that would prevent

15  one from remembering simple facts about oneself or remembering

16  simple -- remembering events that have happened to one, such as

17  being arrested.  One would have to have an impairment that

18  would prevent one from understanding the legal process or the

19  charges against someone, and I did not find him to have an

20  impairment that would explain his sudden inability to do those

21  mental tasks.

22  Q.   What, if anything, did you ask the defendant about whether

23  he had a job?

24  A.   I tried to interview him in-depth about his job, but he

25  really was not cooperative with answering those questions.  I

1    asked him where he worked, what he did, how he got to work, who

2    he interacted with at work, who was his boss, what was his

3    relationship like with his boss, what were the tasks he had to

4    do at work, how long he had been working there, what was the

5    name of the facility where he worked.  So all of those type of

6    questions, but he really wouldn't answer any of those

7    questions.

8    Q.  What is your understanding of whether the defendant is

9    employed?

10   A.  My understanding is that he is employed and has been

11   employed for some time at a medical facility.

12   Q.  How did you learn that?

13   A.  I spoke with a social worker who was involved in his

14   placement in that employment.  The social worker's name is

15   Roberto Toledo.

16   Q.  What did Mr. Toledo tell you about his employment?

17   A.  Mr. Toledo told me that he was affiliated with a

18   psychiatric clinic where German Marmolejos is a patient, and

19   that the social worker Roberto Toledo's job is to help find

20   employment for patients in the clinic; that he had met with

21   Mr. Marmolejos extensively over a lengthy period of time and

22   had gotten to know him; that he had referred him for this

23   position at a medical facility where his job is involved with

24   the laundry, processing of laundry, and he explained to me a

25   lot of detail about what the job entails.

1      The job entails -- it's a relatively complicated job

2   from what I understood.  It entails sorting laundry that is

3   color coded.  So Mr. Marmolejos had to learn which colors

4   represent which department's laundry in the medical facility,

5   had to sort the laundry accordingly, and then had to deliver it

6   to those departments.  And it's a pretty large facility.  So my

7   understanding from Mr. Toledo is that he then had to transport

8   that laundry to those departments, and he had to know where

9   they are, how to get there, how to get back and so forth.

10      Mr. Toledo reported to me that it did take him

11   somewhat longer than the average person to learn the job, but

12   that he did learn the job and that he was functioning well in

13   the job.

14      THE COURT:  Did you say complicated or uncomplicated?

15      THE WITNESS:  It sounded to me like a relatively

16   complicated job, and I qualify that in the sense that it seemed

17   to involve, based on the description of it, a number of

18   cognitive processes.  So it was a helpful, a very helpful piece

19   of information in terms of assessing intellectual disability

20   because the job involves working memory, which is holding

21   pieces of information in your mind at the same time.  That's

22   like the desktop on your computer that has to hold information

23   at one period of time.  That's what we call working memory.

24      And so sorting laundry and knowing where it has to go

25   involves working memory.  It involves long-term memory in the

1    sense that he has to remember where to deliver the laundry.  It

2    involves spatial memory in terms of having a sense of

3    direction.  It involves social skills because he's interacting

4    with others in the facility.  So, to me, if you're thinking

5    about someone with intellectual disability, that's a relatively

6    complicated job that someone with severe intellectual

7    disability wouldn't be able to perform.

8    Q.  What, if anything, did the defendant tell you about how he

9    gets to and from work?

10   A.  Well, he was very terse, and I would say evasive on that

11   topic, but he did say that he drives -- I was told by

12   Mr. Toledo, the social worker, that he drives to and from work;

13   and that was confirmed by his girlfriend as well, that he

14   drives alone to and from work.

15   Q.  And you've discussed his terse and evasive answers to some

16   of your questions.  Were there any questions you asked

17   Mr. Marmolejos to which he was more cooperative in his

18   response?

19   A.  Yes.  What was striking was that questions about his

20   personal history or his legal history, he was not forthcoming

21   about answering those questions.  But with regard to asking him

22   questions about possible delusion or hallucinations, he was

23   much more forthcoming and was willing to talk about those

24   things, and he was also quite willing to answer cognitive

25   testing questions that were posed to him.  He answered those

1    quite promptly and always incorrectly.

2    Q.  What did that relative difference and the manner of

3    response indicate to you?

4    A.  It certainly indicated that there was a selectivity in his

5    responsiveness so that there was some decision process he was

6    making about what he was going to answer and what he wasn't

7    going to answer, and it also indicated to me that that pattern

8    of responsiveness was inconsistent with a mental impairment or

9    a cognitive impairment because individuals, for example,

10   someone with schizophrenia, usually their mental health

11   symptoms are the things they don't want to talk about.  They'll

12   be happy to talk about other things, and they'll talk about

13   them at length.

14          For example, they may talk about their legal case at

15   length, but then become very zipped-up and uncomfortable if

16   you're asking them about their mental health history.  So this

17   was a striking flip, that he didn't want to talk about anything

18   about his legal case; but then if I asked him about some of the

19   hallucinations or delusions that had been reported in prior

20   evaluations, he would very promptly answer those questions.

21   Q.  And you mentioned cognitive testing.  What, if any,

22   cognitive testing did you administer to the defendant?

23   A.  I performed the Folstein mini-mental state examination,

24   which is a cognitive test that looks at a variety of

25   parameters, including attention, basic reasoning ability,

1    short-term and long-term memory.  So I performed that test, and

2    then in addition I performed some additional, more specific

3    cognitive tests that were geared to an even lower level of

4    functioning.

5    Q.  Speaking about the Folstein exam, how did the defendant

6    score on that test?

7    A.  He scored a one out of 30, which is an extremely low score.

8    You could call it an abysmally low score.

9    Q.  What generally is the range of scores on the Folstein exam?

10   A.  So, one doesn't need to get a high score on the Folstein

11   mini-mental examination to be considered normal.  The cutoff is

12   23.  So you can certainly get a number of questions wrong on

13   the test, but anything less than 23 may indicate some kind of

14   an impairment.

15           But what was striking is I routinely evaluate

16   individuals with dementia or other cognitive issues, and for

17   someone who ambulates into my office, is able to walk into the

18   office, I've never seen someone score that low.  Even people

19   with advanced dementia would score at least tenfold higher.

20   They would at least get a 10 or 11 or 12.  The kind of score he

21   got, one out of 30, would be much more consistent with someone

22   who was totally delirious in the hospital.

23           So, if I'm called to, let's say, a surgical unit where

24   someone has had a surgery, and they're completely delirious,

25   their brain is not functioning, they may be so confused that

1   they can only get one answer right on that test.  So one out of

2   30 was a very, very low score, and to me it was strikingly

3   inconsistent with everything else that I learned about his

4   functioning and also with his presentation in my office.

5   Q.  How does the Folstein exam end?

6   A.  The final question on the Folstein exam is a procedural

7   question.  It involves giving someone a simple task, and that's

8   geared toward testing things like working memory and attention.

9   The task involves asking -- handing someone a piece of paper

10  and asking them to take it in their right hand, fold it in half

11  and put it on the floor or put it on the table.  That's the

12  last question on the exam.

13  Q.  What did the defendant do when you gave him those

14  instructions?

15  A.  So what he did was, he took the paper, he stared at it for

16  awhile, and then he decided to crumple it up into a ball and

17  then he stuffed it into my tissue box on the table.

18  Q.  What conclusions did you draw from that?

19  A.  I found that to be very unusual.  It's not something that

20  to me was consistent with a mental illness or intellectual

21  impairment.  It seemed to me quite theatrical.

22  Q.  You mentioned you also asked the defendant general

23  cognitive questions.  What sort of questions did you ask the

24  defendant?

25  A.  So, because he scored so poorly on the Folstein exam, I

wanted to ask him very basic cognitive questions. So I asked

him things like, what is two plus two, or if you have $2 and

you buy an apple for $1, how much change would you get, things

like that.

Q. How did the defendant answer those questions?

A. So he was very willing to answer those questions. He

answered them very promptly and firmly and always wrongly, and

I think I detailed it in my report, I can refer to it. So I

asked him what is two plus two, and he said two. I gave him a

number of opportunities to answer that. I asked him what is

one plus one, and he said one. Again, I gave him a number of

opportunities.

        I asked him if I have three apples -- I tried to give

him more practical examples. I said, if I have three apples

and I give the Spanish language interpreter one apple, how many

apples would be left over; and he said that she would have

three apples. And, again, we went over that a number of times,

and so on and so forth.

Q. In your experience, is it typical for individuals suffering

from psychiatric impairments to answer those questions in that

way?

A. It is not.

Q. Did he answer any cognitive question correctly?

A. I don't think that he answered any correctly. He got a one

out of 30 on the Folstein. I don't remember offhand which

question -- he must have answered one question correctly. I don't remember offhand which question that was.

Q. And you mentioned earlier the collateral interviews that you conducted, and we discussed the conversation you had with Mr. Toledo. What else, if anything, did you learn about the defendant from the collateral interviews?

A. I learned that he came to this country when he was 16; that he has worked at various jobs for most of the ensuing years. I learned that he is able to drive and has a driver's license; that he performs basic activities of daily functioning on his own, like bathing himself and feeding himself and clothing himself. I learned that he has been in a long-term relationship with the same woman for many years. So those are the kinds of things I learned about his functioning.

Q. What did those things indicate to you about his functioning?

A. Well, those factors spoke to a relatively high level of functioning, so that was important information. And it was also important because it was not consistent with his presentation in my office and his very poor performance on the cognitive tests that were given to him.

Q. Do you know if the defendant can read or write?

A. So he would not answer that question directly. What I know from a review of his record is that he reported to the psychologist who examined him that he had, I believe the quote

1    was, "little" or "very little" reading and writing, so that

2    indicated to me that he had some reading and writing but was

3    not fully literate.

4    Q.  What does the fact that he might have some reading and

5    writing skills indicate to you?

6    A.  Well, it would certainly indicate that he does not have

7    profound mental retardation or profound mental disability

8    because the ability to decode language, decode written language

9    would not be consistent with that.

10   Q.  Do you know anything about the defendant's understanding of

11   his legal case at the time of his arrest?

12   A.  So in my examination, he flatly denied that he had ever

13   been arrested.  From my review of the report of the

14   investigation, it is indicated there that shortly after being

15   arrested, he requested an attorney.

16   Q.  What does that indicate to you?

17   A.  That indicates to me that he had an understanding that he

18   was in legal jeopardy and that an attorney would be able to

19   assist him in that situation.

20   Q.  Is that consistent with your conversations with the

21   defendant in your evaluations?

22   A.  It is not.

23   Q.  You testified that during the evaluation, the defendant was

24   unable to recall recent events including his legal case.  How

25   is that different from what you reviewed more generally about

1   the defendant?

2   A.   So, it was also inconsistent with other available

3   information about him.  So, again, with reference to his job,

4   his functioning at his job and driving and so forth, it

5   indicates some level of functional memory that is intact, and

6   that would imply that he would have the capacity to remember

7   that he had been arrested or remember the name of his defense

8   attorney.

9          But, in addition, and more specifically, he indicated

10  to the psychologist who had examined him that he knew he had

11  been arrested; that he knew the name of his defense attorney;

12  that he broadly understood the reason for the examination with

13  the psychologist, whereas those are all things that he either

14  specifically wouldn't answer or denied knowing when I met with

15  him.

16  Q.   You've discussed driving several times.  What sort of

17  functional capabilities are required to drive?

18  A.   So driving is a very complicated task, and it involves

19  visual spatial memory.  It involves working memory; so, being

20  aware of the conditions on the road and being able to keep in

21  mind changing conditions on the road, having a high level of

22  ability to execute procedures that are consonant with what one

23  is processing cognitively.  So to be able to signal that you're

24  going to merge and to time that properly.  It involves

25  long-term memory in terms of knowing where you're going.

1        So it's a complicated task, and his --

2   Mr. Marmolejos's ability to drive indicates, again, that he

3   does not have a profound intellectual disability if he has an

4   intellectual disability.  It also implies that he passed the

5   written examination for his driver's license which would

6   indicate some degree of literacy and an ability to do a

7   pencil-and-paper type of test.

8   Q.  And you mentioned the defendant's relationship with his

9   girlfriend.  What do you know about that relationship?

10  A.  I spoke with his girlfriend.  I understand that that

11  relationship has gone on since they were both in their teens;

12  that he has been in a stable, long-term relationship; that they

13  have been living together for, I believe, a number of years;

14  and that he has been a reliable and supportive partner to her

15  over the course of that period of time.

16  Q.  Is that consistent with how the defendant presented to you

17  in your evaluations?

18  A.  I would say it was not because he presented as so impaired

19  that one could simply not imagine him being a partner of any

20  kind to a functional adult.

21  Q.  What did you understand about how the defendant takes care

22  of himself in his day-to-day life?  What do you understand

23  about that?

24  A.  I understand he is fully independent in that regard.  He

25  showers, he grooms himself, he dresses himself, he can prepare

1   food for himself, he cooks.  He's not in any way an invalid or

2   someone who needs to be cared for.

3   Q.   Is that consistent with how he presented in your

4   evaluations?

5   A.   Again, it is not.  He presented in my evaluation as really

6   not being able to perform even the most simple cognitive tasks.

7   Q.   Based on your evaluation of the defendant at the time that

8   you authored your report, did you have an opinion about whether

9   the defendant is competent to stand trial?

10  A.   Yes, I did.

11  Q.   What is your opinion?

12  A.   My opinion is that he is competent to stand trial.

13  Q.   How did you come to reach that opinion?

14  A.   I came to that opinion through my assessment of him which

15  included my direct examination of him, my review of documents,

16  my discussion with collateral informants.  That was the basis

17  for my opinion.

18  Q.   What is your opinion on whether Mr. Marmolejos is

19  malingering?

20  A.   My conclusion was that he was malingering during the

21  evaluation.

22  Q.   And that's based on?

23  A.   My conclusion was based on the selectivity with which he

24  answered questions, not wanting to answer some questions in

25  some domains while answering questions in other domains and

specifically answering questions in domains which would lead

one to conclude he is ill.  For example, being more responsive

to describe symptoms that might be consistent with mental

illness whereas not wanting to talk about things related to his

legal case.  In addition, scoring so poorly and in a manner

that is inconsistent with any known psychiatric condition on

cognitive testing that led me to conclude there was

malingering.

        In addition, he made what is a classic error of

malingerers who are trying to score low on cognitive testing is

that they typically answer questions wrong -- they take an

approach where they think they have to answer all questions

wrongly to show that they have limited cognitive ability

without realizing that really only individuals with very severe

profound mental retardation wouldn't be able to say that two

plus two is four.  Even individuals with mild or moderate

retardation would be able to answer that question.

        Certainly someone who is able to drive and work and

function the way he does, it's just very inconsistent for him

not to know that if I have three apples and I give away one

apple that I would be left with two apples.  So that kind of

answer and the fact he was so quick to answer and consistent

and wrong in those answers indicated to me that he was

malingering.

Q.  The defendant's supposed memory loss that you observed in

1   your evaluation, can that be explained by the condition that

2   he's been diagnosed with?

3   A.   It is not consistent with the conditions he's been

4   diagnosed with, and I would go into some detail on that.

5        My answer would include that schizophrenia does not

6   impair memory.  Schizophrenia is not a disorder of memory, so

7   one would not expect any memory impairment in the case of

8   schizophrenia.  There is no reason that someone with

9   schizophrenia wouldn't remember that they were arrested.  So

10  that was inconsistent.

11       PTSD is also not a disorder of memory.  If anything,

12  people with PTSD have trouble forgetting.  That's the problem

13  with PTSD.

14       And intellectual disability may or may not have a

15  memory dimension to it.  Someone with intellectual disability

16  may or may not have a memory impairment, but that should be a

17  stable impairment if there is one.  So it would not be

18  consistent for him to remember things in March of 2018 or in

19  September of 2018 when he spoke to the forensic psychologist,

20  and then not be able to remember things just a month later in

21  October of 2018 when he was speaking to me; that would not be

22  consistent with an intellectual disability.

23  Q.   What, if anything, does his behavior tell you about whether

24  he understands the nature of his criminal case?

25  A.   Well, his behavior indicates to me that he has an

1    understanding that he is in legal jeopardy; that he is in a --

2    has a legal case with severe consequences to it; and that his

3    response to the pressure he is under is to take a stance that

4    he just doesn't understand and doesn't remember.

5    Q.  What, if anything, does his behavior tell you about whether

6    he is capable of assisting his attorney?

7    A.  It indicates to me that he is making choices about his

8    behavior and that he is able to assist his attorney if he

9    chooses to do so, just as he's able to work because he chooses

10   to work.  So that was my conclusion.

11              MR. NESSIM:  May I have a moment, your Honor?

12              THE COURT:  Sure.

13              (Pause)

14              MR. NESSIM:  Nothing further.

15              THE COURT:  Let me just ask a couple questions myself,

16   and then we will take a five minute break before proceeding

17   with cross-examination.

18              First of all, your report on pages 11 and 12

19   references a letter from Mr. Marmolejos's girlfriend.  Can you

20   tell me what letter that was?

21              THE WITNESS:  I believe that that letter was included

22   in the mitigation letter that was prepared by defense counsel.

23   So I believe that she included a number of statements of people

24   who know Mr. Marmolejos, and there were statements I believe

25   from the other family members that I interviewed as well, but

1    in particular his girlfriend wrote a rather extensive letter

2    talking about her interactions with him over the years.

3         THE COURT:  Second, is it your -- I understand your

4    testimony is that in your opinion Mr. Marmolejos is competent

5    to stand trial.  I think you testified it was your

6    understanding that the competency standard is sort of

7    multi-pronged.  I just want to understand what the basis of

8    your ultimate conclusion is.  Is it your opinion or do you --

9    in your opinion, does he have schizophrenia?

10        THE WITNESS:  So I think that based on the information

11   I have, I cannot conclude to a degree of medical certainty that

12   he has schizophrenia.  The symptoms that were used to come to

13   that conclusion were his report of hallucinations.  So, like

14   hearing his grandfather's voice.  And while that may indicate

15   psychosis, there are other circumstances in which you could

16   hear voices of deceased persons.

17        For example, people with trauma may hear the voice of

18   their abuser, and I understand that he was abused by his

19   grandfather.  So the information that I have on his psychiatric

20   history is not dispositive to my mind that he has

21   schizophrenia.  He may or may not have it.  It wasn't clear to

22   me that he has psychosis.

23        THE COURT:  With respect to that, what significance,

24   if any, would the diagnosis that was made in 2016 by Dr. Arroyo

25   have?  That was before the legal proceedings.

1          THE WITNESS:  I thought Dr. Arroyo's conclusion was a

2     little bit precipitous.  I would not diagnose someone after a

3     single meeting with schizophrenia, particularly not someone

4     with a complicated history that was reported in that meeting.

5          So he reported a very long history of abuse, and

6     again, he reported things like hearing the deceased

7     grandfather's voice.  And so myself in that situation, I would

8     reserve judgment and want to get to know him better before I

9     would just diagnose him with schizophrenia.  It wasn't a

10    clear-cut diagnosis to me.

11         THE COURT:  All right.  Counsel asked you some

12    questions earlier of I think you said you had evaluated

13    hundreds or certainly more than a hundred defendants for

14    purposes of competency, and more than you could count, you had

15    opined, were not competent to stand trial.

16         THE WITNESS:  Yes.

17         THE COURT:  Can you estimate of those you've evaluated

18    how many you've concluded were malingering?

19         THE WITNESS:  I would say that that's rare.  I could

20    probably count on one hand the number of patients where I

21    opined directly that they were malingering.

22         THE COURT:  When you say "directly," why do you --

23         THE WITNESS:  Well, sometimes one suspects

24    malingering, but there is a -- one cannot come to that

25    conclusion with certainty.  And because malingering is a pretty

1  strong statement to make, I usually really reserve that unless

2  I can really conclude that to a reasonable degree of medical

3  certainty.  In this case I felt that his answers were so

4  inconsistent both with what I know about medical and

5  psychiatric conditions and with his presentation elsewhere in

6  other settings that I just couldn't conclude anything else.

7            THE COURT:  And, lastly, you've commented a little bit

8  on sort of what could and couldn't change over time, and in

9  particular I think with respect to the memory loss that you had

10  described.  Can you generally describe with respect to both

11  schizophrenia and PTSD whether and to what extent those

12  conditions and the symptoms related to them can sort of change

13  over time?

14            I think it's probably obvious, but the record here we

15  have evaluations at different points in time.  So one question

16  I have is whether things could change in the periods of time

17  that are marked by those evaluations.

18            THE WITNESS:  Absolutely.  So I think that symptoms of

19  psychosis can wax and wane.  In fact, they typically do.  So

20  someone with psychosis can have an exacerbation of their

21  condition.  And in psychosis that would typically involve

22  having a worsening of their psychotic symptoms, so becoming

23  more delusional or hallucinating even more, but it wouldn't

24  typically affect memory because, again, schizophrenia is not a

25  memory disorder.  So that I think would cover schizophrenia.

1          With regard to intellectual disability, intellectual

2    disability should not wax and wane.  That is a chronic stable

3    condition.  So you wouldn't expect to see a memory impairment a

4    few months ago and now not see it or vice versa.  It should be

5    very consistent and the same.

6          And PTSD, it can be a self-limited condition or it can

7    be a chronic condition.  If it is a chronic condition, it can

8    certainly be exacerbated by other stressors, but again, that

9    wouldn't affect your memory.  It could affect just the degree

10   of PTSD symptoms that you're having, so one could have more

11   intrusive thoughts about the trauma or be more on edge if they

12   were under stress and they already had PTSD, but they still

13   should be able to remember basic facts about themselves.

14          THE COURT:  One clarification.  Your report seems to

15   be dated February 22, 2018.  I assume that is a typo?  I assume

16   it's 2019.

17          THE WITNESS:  That's a typo.

18          THE COURT:  That makes more sense.

19          More specifically, can you comment on the changes --

20   obviously, you weren't present for the evaluations by Dr.

21   Fernandez or Dr. Arroyo, but to the extent that they are

22   accurately reflected in their respective reports or letters,

23   can you comment on the changes reflected between those and your

24   evaluations and what significance that may have had?

25          THE WITNESS:  So, with Dr. Arroyo, Mr. Marmolejos was

1    able to talk about his personal history.  He was able to detail

2    his life course.  And his counselor also indicated that he was

3    able to discuss with him the various issues that were important

4    in his life.

5        In the evaluation, Mr. Marmolejos had with

6    Dr. Fernandez, he really provided a very detailed history.  He

7    provided a lot of biographical information that was very vivid

8    about the abuse that he sustained from his grandfather, but

9    also a lot of information that was very vivid about farm life.

10   He explained what the morning routine was; that he would have

11   to get ready at night before he woke up because he would have

12   to get up in the dark; that he would work with animals, how he

13   worked with the animals, how he would balance things on his

14   shoulders that he had to carry.  He just provided a lot of

15   vivid detail and information about farm life from many years

16   ago which indicated intact long-term memory.

17       And he also indicated that he knew he had been

18   arrested; that he knew who his defense attorney was, that he

19   knew the purpose of the evaluation.  So to me that was

20   inconsistent with how he presented when I met with him, and I

21   could not find a medical or psychiatric explanation for why he

22   wouldn't now be able to remember those things

23       THE COURT:  All right.  Thank you.  So, as I said,

24   let's make it a seven minute break.  So it's 11:05.  We'll pick

25   up again at 11:12.  Just for your planning purposes, I have

1    another commitment at 1:00.  So we will take a break at 1:00

2    for lunch if we are not done and then pick up again I guess at

3    2:00, but hopefully we'll move things along.  I'll see you in

4    seven minutes.  Thanks.

5              (Recess)

6              THE COURT:  My seven minute break turned into a 17

7    minute break, which is why I don't like taking breaks at all,

8    but there you have it.

9              Dr. Cohen, you remain under oath, and we will proceed

10   with cross-examination.

11   CROSS-EXAMINATION

12   BY MS. WILLIS:

13   Q.  Dr. Cohen, you testified earlier that the process for doing

14   a forensic examination is a complicated one?

15   A.  Yes.

16   Q.  That it involves sort of many different parts?

17   A.  Yes.

18   Q.  An evaluation, a meeting, an interview with the person

19   you're evaluating?

20   A.  I'm sorry?

21   Q.  An evaluation or a meeting with the person you're

22   evaluating, that is part of it.

23   A.  Is that a question or --

24   Q.  Yes.

25   A.  What's the question?

1    Q.  An evaluation or a meeting with the person that you are

2    evaluating is an important part of it?

3    A.  Yes.

4    Q.  A review of documents?

5    A.  Yes.

6    Q.  And collateral interviews with other people who might know

7    the subject?

8    A.  What I would say is that to the extent possible it's

9    important to seek other sources of information, yes.

10   Q.  And when you are doing an interview with the person you're

11   evaluating, the specific words that you use as part of that

12   evaluation are important?

13   A.  I would say that words are an important part of an

14   evaluation.

15   Q.  And the specific way in which they respond is an important

16   factor that you consider?

17   A.  It may be.

18   Q.  And the specific words that they use, the word choice may

19   be an important factor that you consider?

20   A.  They may be.

21   Q.  So your ability to communicate with the person you're

22   interviewing is an important factor?

23   A.  It may be.

24   Q.  Now, Dr. Cohen, you are obviously fluent in English?

25   A.  Yes.

J43QMARh                    Cohen - Cross

1   Q.  You speak Hebrew as well?

2   A.  Yes.

3   Q.  And you can read both Greek and Latin?

4   A.  Yes.

5   Q.  But you are not fluent in Spanish?

6   A.  No.

7   Q.  Mr. Marmolejos does not speak English?

8   A.  I'm not sure whether that's the case or not.

9   Q.  His native language is certainly Spanish?

10  A.  His native language to my understanding is Spanish.

11  Q.  So in your interviews with him, you were not able to

12  communicate with him directly?

13  A.  I wouldn't completely agree with that.

14  Q.  You weren't able to speak to him without an intermediary in

15  a language that he understood?

16  A.  Again, I wouldn't completely agree with that.

17  Q.  In order to engage in your interview with him, you had

18  someone there who could speak Spanish?

19  A.  I did have an interpreter present for the evaluation.

20  Q.  And you would speak English in the evaluation?

21  A.  Yes.

22  Q.  And then that interpreter would interpret that into Spanish

23  and speak Spanish to Mr. Marmolejos?

24  A.  That's correct.

25  Q.  The answers that he gave, such that they were, were in

1    Spanish?

2    A.   His verbal responses were in Spanish.

3    Q.   And then the interpreter had to interpret or translate

4    those back into English for you to understand?

5    A.   I have some understanding of Spanish, so some -- but yes,

6    the interpreter did translate every statement that he made.

7    Some of them I understood myself, but some of them I did need

8    the interpreter to interpret.

9            I should also say that his girlfriend was present for

10   the second interview for the entirety of the interview, and she

11   also participated in explaining what Mr. Marmolejos was

12   communicating.

13   Q.   We'll get to that in just a moment.

14           First, I want to ask you about this interpreter.  An

15   official interpreter who is used in a court setting, for

16   example, would be required to have specialized training?

17   A.   Is that a question?

18   Q.   It is a question?

19   A.   So what is the question?

20   Q.   An official interpreter who would be used in a court

21   setting, for example, would be required to have training?

22           MR. NESSIM:  Objection.  Foundation.

23           THE COURT:  Is it your understanding that that is the

24   case for an official interpreter in court?

25           THE WITNESS:  I am not familiar with the standards for

1    court interpreters.

2    Q.   Then let's talk about medical interpreters.  In a hospital

3    setting, when a patient comes in, family members are not

4    supposed to be used, unless it's an emergency, to interpret for

5    that patient?

6    A.   Family members for privacy reasons, not for language

7    reasons are not the preferred interpreters, but it's not

8    related to their training; it's simply to respect patient

9    privacy.

10   Q.   Someone who is fluent in Spanish might not necessarily know

11   medical terminology or medical jargon in Spanish?

12   A.   That was not the case for my interpreter, but also in my

13   interviews -- in my psychiatric interviews, forensic or

14   otherwise, I don't use any jargon because really as a physician

15   I don't use jargon with patients because that's not helpful.

16         My purpose is to use very, very simple language.

17   That's all that's necessary for understanding medical concepts

18   or information that you glean in an interview.  So it's

19   something that I put a lot of effort into to make sure that I'm

20   not burdening any patient or evaluee with any jargon.

21   Q.   So in answer to my question about a person who is fluent in

22   Spanish may not know medical terminology, it's either yes, no,

23   or you don't know?

24   A.   Was that -- I'm sorry, can you repeat the question?

25   Q.   A person who is fluent in Spanish may not know medical

1  terminology.  Yes, no, or you don't know?

2  A.  I suppose anyone may or may not know medical terminology,

3  and that would certainly be true for people who are fluent in

4  any language.

5  Q.  For someone to qualify to be a medical interpreter at a

6  hospital setting, they have to take a test?

7              MR. NESSIM:  Objection.  Foundation.

8              THE COURT:  If you know.

9  A.  I don't think that -- well, the way I -- I don't think I

10 can answer that question in a yes-or-no format.

11 Q.  Well, they have to be certified either through the National

12 Board of Certification of Medical Interpreters or the

13 Certification Commissioner for Healthcare Interpreters,

14 correct?

15 A.  Again, I can't answer that question in a yes-or-no format.

16 Q.  Let's talk specifically about the interpreter that you

17 utilized.  That person was not certified through the National

18 Board Certification of Medical Interpreters?

19 A.  No, she was not.

20 Q.  That person was not certified through the Certification

21 Commissioner for Healthcare Interpreters?

22 A.  No, she was not.

23 Q.  That person was not someone who was impartial.  And what I

24 mean by that is, this is not an outside interpreter that you

25 hired to come in to assist with the interview?

1    A.  I cannot answer that question in a yes-or-no format.  There

2    were two questions in that question, but the first question I

3    cannot answer in a yes-or-no format.

4    Q.  This person was not an outside person that you hired from

5    an outside entity to come in to assist in this interview?

6    A.  No.  She frequently works with me as an interpreter.

7    Q.  And she works in your office?

8    A.  Correct, she's on my staff and frequently interprets for me

9    in forensic and in clinical settings.

10   Q.  So she is an employee of yours?

11   A.  Correct.

12   Q.  Now, you talked about Mr. Marmolejos's partner being

13   present for the second interview.  Yes?

14   A.  Yes.

15   Q.  So -- actually, before we get to that, you described

16   earlier that sort of how he presented when he arrived at your

17   office for both of these interviews.  Do you recall talking

18   about that moments ago?

19   A.  I do.

20   Q.  And you said that he arrived on time?

21   A.  He arrived early is what I said.

22   Q.  That when you -- you know, he wasn't disruptive in the

23   waiting area?

24   A.  I don't think I said he wasn't disruptive, but it's true

25   that he was not disruptive.

1    Q.  So the answer is yes, he was not disruptive in the waiting

2    area?

3    A.  That's true.

4    Q.  You said that when you called him to come back, that he

5    quickly got up and walked back to the office?

6    A.  Again, I don't know what the direct quote is, but yes, he

7    was responsive to my request that he come into the consulting

8    room.

9    Q.  Now, on neither one of these occasions, the October

10   interview or the December interview, neither occasion did he

11   come to your office alone?

12   A.  That is correct.

13   Q.  Specifically, a cousin came with him for the first

14   interview?

15   A.  Yes.  As I indicated in my report, for the first interview

16   the cousin came, and for the second interview his girlfriend

17   came at my request.

18   Q.  And the cousin did not come into the interview; the cousin

19   waited in the waiting area?

20   A.  That is correct.

21   Q.  But for the second interview, you specifically requested

22   when that interview was being set up that his girlfriend

23   accompany him?

24   A.  Correct.

25   Q.  And rather than having her wait in the lobby, you actually

1   brought her into the interview?

2   A.   Correct.

3   Q.   You said that typically in the medical field the reason

4   that family members aren't used to interpret is because of

5   concerns about privacy?

6   A.   That is true for non-forensic evaluations, yes.  But they

7   may interpret.  They're just not the preferred interpreter.

8   She was not an interpreter in my office, but I did want her

9   present for other reasons during the interview if he would

10  grant permission, which he did.

11  Q.   One of the concerns though you said about using family

12  members just for interpretation broadly is a concern about

13  privacy?

14  A.   Again, she was not an interpreter in my office, but yes,

15  that is a concern in the medical setting with using family

16  members, and so it has to be taken into consideration.

17            THE COURT:  Can I interrupt for a moment?

18            MS. WILLIS:  Yes.

19            THE COURT:  First of all, why did you want her present

20  for the second interview?

21            THE WITNESS:  So I found him uncooperative during the

22  first interview and in fact during the second interview, and

23  from what I could gather about him, it seemed the person he was

24  most comfortable with was his girlfriend, and so I wanted to

25  have her present to see if that would make him more comfortable

1    and more cooperative during the interview.

2            And I did ask his permission for that, and of course

3    asked her whether she would be willing to do that, and that is

4    something that I do not infrequently in forensic evaluations.

5            THE COURT:  When you say you asked his permission, do

6    you recall precisely what you asked him, how and what he

7    answered?

8            THE WITNESS:  I said to him that I would like to have

9    his girlfriend present, that I thought it would be helpful, and

10   would that be OK with him.  And he nodded that it was OK with

11   him.

12           THE COURT:  He nodded?

13           THE WITNESS:  He nodded, yes.

14           THE COURT:  All right.  You may proceed.

15   BY MS. WILLIS:

16   Q.  Actually, before I proceed, this request to have her come

17   to the interview is not mentioned in your report?

18   A.  I do mention that she was there.

19   Q.  You also mention that the cousin was there, but the cousin

20   was outside and she was inside, correct?

21   A.  Correct.

22   Q.  So the fact that there was a difference between the second

23   interview with her than the one with the cousin, that is not

24   reflected in your report?

25   A.  Correct.  I state that he was accompanied to the first

1   interview by his cousin and to the second interview by his

2   girlfriend.  I did not specifically comment on her being

3   present during the interview.

4   Q.  Now, having an outside person in an interview may in some

5   circumstances make someone feel more comfortable, which is what

6   you just said?

7   A.  Sure.

8   Q.  But there may also be circumstances where the person is

9   made uncomfortable by having a close friend or family member

10  present.  For example, if you're discussing things that maybe

11  that person is not aware of, and they're embarrassed or

12  concerned about them hearing about it?

13  A.  I did not see any difference in his presentation between

14  either interview.

15  Q.  I'm saying in general having an outside person in an

16  interview may affect how the subject responds to questions.

17  Yes?

18  A.  It may.

19  Q.  It may affect -- it may distract them, the fact that there

20  is this close family member who is in the interview?

21  A.  It may or may not.

22  Q.  Now, you talked earlier about the fact that

23  Mr. Marmolejos's partner wasn't the official -- she was not the

24  official interpreter for the session?

25  A.  That was not her purpose in the interview.  That was not

1    why I requested for her to be there.

2    Q.  So the answer is yes, she was not the official interpreter,

3    correct?

4    A.  The answer is no, she was not the official interpreter.

5    Q.  But you said that she did assist in the interview?

6    A.  I am not sure that I said that.

7    Q.  Well, let me specifically --

8    A.  No, I wouldn't say -- if I did, then I spoke in error.  I

9    would certainly not say that she assisted in the interview.

10   That would not be correct.

11   Q.  Let's talk about what she did do.  First, in terms of

12   language, there were some words that Mr. Marmolejos used that

13   both you and your office interpreter did not know the meaning

14   of?

15   A.  I don't think that's correct.

16   Q.  Let me give you an example.  At the very beginning of the

17   interview when asking how is Mr. Marmolejos, how is he feeling,

18   he used a word that you and the interpreter said you looked up

19   and you believe meant tree?

20   A.  I don't recall that.

21   Q.  And then when you spoke to his partner, she said that it

22   was a colloquialism in the Dominican Republic, and it meant

23   strong?

24   A.  No, I don't -- what I recall from the interview is that

25   there were times where he used words that did not have a clear

meaning or made utterances that did not have a clear meaning.
And I would say that maybe it happened two or three times, not
more than that.  And that on those occasions we did -- my
interpreter did ask his girlfriend whether she was aware of
some Dominican dialect -- because my understanding is they both
have roots in the Dominican Republic that could explain those
words or not, and to my memory, maybe on one occasion she did
know what the word meant and on other occasions she also wasn't
sure what Mr. Marmolejos was saying.

Q.  So, to clarify, there were at least a few occasions on
which there were words that he used that you did not know the
meaning of.  Yes?

A.  No.

Q.  That you personally did not know the meaning of.  That's
what I'm asking first.

A.  I said they were utterances.  I'm not sure they were words
or not.

Q.  And you said that you did not know the meaning of those
words or utterances or sounds, correct?

A.  My interpreter did not know.  I do not consider myself an
expert in Spanish.

Q.  So first the answer is, you did not know, correct?

A.  I don't speak Spanish, correct.

Q.  And your interpreter also did not know?

A.  Yes, she did not recognize on two or three occasions an

1   utterance that he made, that is correct.

2   Q.  You said that you believed that it might be some type of

3   sort of a Dominican phrase or something and that, therefore

4   Ms. Fleet, his partner might know what these sounds meant?

5   A.  If I stated that I believed it, then I was incorrect.  My

6   interpreter, who is a native Spanish speaker, she believed that

7   she thought it was gibberish, but she thought that it's

8   possible it's some kind of Dominican slang, and so she asked

9   Ms. Fleet whether she thought -- what it meant.  That was the

10  extent of the interaction.

11  Q.  I take it from that, that your interpreter is not from the

12  Dominican Republic or is not Dominican in origin?

13  A.  No.  She is a native Spanish speaker with a Colombian

14  background.

15  Q.  You said on at least one occasion Ms. Fleet was able to

16  give an explanation or a definition of one of these utterances?

17  A.  I believe on one occasion she did, yes.

18  Q.  And there were also occasions where your interpreter posed

19  a question to Mr. Marmolejos, and when he did not respond, you

20  asked Ms. Fleet to then pose the same question to

21  Mr. Marmolejos?

22  A.  I do not -- I would not agree with that.  There were

23  occasions when I asked Mr. Marmolejos a question, and my

24  interpreter tried in a number of different ways to get a

25  response from him.  And then there would be an interaction

1    between Ms. Fleet and him regarding that question, and I was --

2    and we would observe that interaction and then ask her what --

3    ask Ms. Fleet to tell us what was the interaction that she just

4    had with him.  That's how I would describe it.

5          But I did not pose questions to Ms. Fleet to

6    interpret.  That did not occur.

7    Q.  Now, you said that there were occasions where she,

8    Ms. Fleet, and Mr. Marmolejos would have an interaction after a

9    question was posed.  Yes?

10   A.  Yes.  Again, there were probably two or three occasions

11   toward the end of the interview where that happened.

12   Q.  And you said then after that interaction was over, you

13   asked Ms. Fleet to describe for you what the interaction about?

14   A.  Yes.

15   Q.  Now, to be clear, Ms. Fleet and Mr. Marmolejos were sitting

16   on a couch feet from you and your interpreter?

17   A.  Yes.

18   Q.  So these interactions weren't something where they're

19   getting up and going to a corner and speaking privately?

20   A.  No.

21   Q.  So you and your interpreter would have been within

22   listening distance of whatever interaction they were having?

23   A.  Of course.  Absolutely.  And that was part of the purpose

24   of the evaluation of having her present because in assessing

25   his purported intellectual disability, one of the things I was

1    interested in was in understanding the interaction between him

2    and his long-term partner.  So being able to observe that was

3    part of the data that I was seeking to elicit in the second of

4    the two interviews.

5    Q.  Let's talk about his diagnoses.  You were aware before you

6    began your interview of Mr. Marmolejos that he had previously

7    been diagnosed with schizophrenia?

8    A.  Yes, I did review the record.  The diagnosis that I had in

9    mind was his evaluation with Dr. Arroyo.

10   Q.  Right.  And that diagnosis took place on February 1 of

11   2006?

12            THE COURT:  2006 or --

13            MS. WILLIS:  I'm sorry.  2016, your Honor.

14   A.  Yes, so that is a -- a note from his chart dated

15   February 1, 2016, and it appears to be an intake evaluation,

16   the first meeting that Dr. Arroyo had with Mr. Marmolejos.

17            MS. WILLIS:  Your Honor, may I approach?

18            THE COURT:  You may.

19            MS. WILLIS:  Thank you.

20   Q.  I'm handing you what I've marked Defense Exhibit 1 for

21   identification.  What I'm handing you is the psychiatric

22   evaluation --

23            (Pause)

24   Q.  What I've handed you is the psychiatric evaluation for a

25   mental health clinic, and you were provided with this document

1   prior to your evaluation of Mr. Marmolejos, correct?

2   A.  Yes, I cite it in my report.

3   Q.  And this is electronically signed by Dr. Arroyo on

4   February 1, 2016, like we just discussed?

5   A.  Yes.

6   Q.  In this evaluation --

7               THE COURT:  May I interrupt for a second?  I have a

8   record that I received in advance of the hearing that I am

9   guessing is the record we're talking about, but I think it says

10  electronically signed on February 28, 2016.  Are we talking

11  about the same --

12              THE WITNESS:  Yeah, you're right.

13              MS. WILLIS:  Oh, I'm sorry.

14              THE WITNESS:  The electronic signature is dated

15  February 28.  The date on the note is February 1, correct.

16              MS. WILLIS:  That is correct, your Honor.  I'm sorry.

17  I was reading from the date below where it said, DD February 1,

18  2016.  It is the same document.

19              THE COURT:  On my copy, there is a handwritten I would

20  interpret it as a correction on page 1 of the report.

21  "Profession" is sort of crossed out and "proficient" appears to

22  be written in.  Is that true on yours as well?

23              THE WITNESS:  Yes.

24              THE COURT:  All right.  So I take it what I have is

25  what you have handed the witness?

J43QMARh                    Cohen - Cross

1          MS. WILLIS:  Yes, your Honor.  I apologize for the

2     date confusion.

3     Q.  Again, this is one of the documents that you've received

4     and that you reviewed as part of your review of records in this

5     matter?

6     A.  Yes.

7          MS. WILLIS:  Your Honor, I would ask that Defense

8     Exhibit 1 be admitted into evidence.

9          THE COURT:  Any objection?

10          MR. NESSIM:  No, your Honor.

11          THE COURT:  Admitted.

12          (Defendant's Exhibit 1 received in evidence)

13    Q.  Now, a little while ago you said that you believed the

14    diagnoses that Dr. Arroyo made were schizophrenia and

15    posttraumatic stress disorder but not intellectual disability?

16    A.  Right.  I said I would need to refer to the note.

17    Q.  And now looking at the note, you see that he did have an

18    access to diagnoses of intellectual disability?

19    A.  Yes, I do.

20    Q.  You also said earlier that you thought the diagnosis of

21    schizophrenia was sort of made too quickly?

22    A.  Yeah, I believe I used the word precipitous or I would say

23    premature.

24    Q.  You said you would personally want to get to know a person

25    better before making a diagnosis?

1  A.  I didn't say that I would want to get to know him better,

2  but I say, yeah, I would want to reserve judgment, I think, on

3  the basis of an initial evaluation, particularly it's not

4  typical to spend two hours with a patient, as I did in a

5  forensic -- in each forensic interview, that's not typical for

6  a clinical intake.

7          Clinical intake is typically about 45 minutes.  I

8  don't know how long this one was, but on the basis of a typical

9  clinical intake, I would say that he prematurely diagnosed

10 schizophrenia as well as intellectual disability.

11 Q.  You are aware that after February 1 of 2018, Mr. Marmolejos

12 continued -- 2016, I'm sorry -- February 1 of 2016,

13 Mr. Marmolejos continued to receive treatment through St.

14 Joseph's Healthcare System?

15 A.  I really did not have, I think, satisfactory information on

16 that.  I requested the entire record from the clinic, and I

17 think what was produced to me by your legal team was just this

18 note in addition to the letter that he had previously

19 submitted, and so on the basis of information that I -- and I

20 also made multiple calls to Dr. Arroyo's office, and they were

21 not returned so I did not have any independent way of verifying

22 that he's an ongoing patient there.

23 Q.  All right.  Thank you.

24          MS. WILLIS:  Your Honor, may I approach?

25          THE COURT:  You may.

1          MS. WILLIS:  Thank you.

2   Q.  I'm handing you what I've marked as Defense Exhibit 2 for

3   identification and Defense Exhibit 3 for identification.

4          THE COURT:  Ms. Willis, do you have copies of these

5   things just to make sure we are on the same page?

6          MS. WILLIS:  I did provide those to the Court, and

7   I've provided them to the prosecution, your Honor, but we will

8   get more clean copies, your Honor, but those were in the

9   documents I sent to your Honor on Monday at about 4:45.

10         THE COURT:  I just want to make sure that what you are

11  marking -- that I am clear on what is what.

12  Q.  So, first let's talk about Defense Exhibit 2 for

13  identification.  That is a letter dated February 19 of 2018?

14  A.  Yes.

15  Q.  And that letter is addressed to Sarah Gomez?

16  A.  Right.

17  Q.  And that letter is signed by a clinician at St. Joseph's

18  Healthcare System, Felix Rodriguez?

19  A.  Right.

20  Q.  And that letter was provided to you prior to you meeting

21  with Mr. Marmolejos?

22  A.  Yes.  And I cite it in my report and discussed it in my

23  direct testimony earlier today.

24  Q.  And Defense Exhibit 3 for identification is a letter dated

25  February 8 of 2018.  Yes?

1   A.   Yes.

2   Q.   And that letter is also addressed to Sarah Gomez?

3   A.   Yes.

4   Q.   And that letter is signed by Luis Arroyo, psychiatrist?

5   A.   Correct.

6   Q.   That letter was also provided to you.  That letter is also

7   referenced in the section of your report where you list medical

8   sources?

9   A.   Correct.

10  Q.   So in those letters, we will focus first on Defense

11  Exhibit 3.

12            THE COURT:  Ms. Willis, are you offering these?

13            MS. WILLIS:  Yes, your Honor, I am offering 2 and 3

14  into evidence.

15            THE COURT:  Any objection?

16            MR. NESSIM:  No objection.

17            THE COURT:  Admitted.

18            (Defendant's Exhibits 2 and 3 received in evidence)

19  Q.   In Defense Exhibit 3, that is a letter from

20  Mr. Marmolejos's treating psychiatrist.?

21  A.   It's just you're making statements.  Is that a question or

22  a statement?

23  Q.   They're all questions.

24  A.   OK.

25  Q.   So that is a letter from his treating psychiatrist?

1    A.  Yes, I believe that's a letter from his treating

2    psychiatrist.

3    Q.  And in this letter, the psychiatrist indicates that the

4    patient -- says, "This is a letter regarding Mr. Marmolejos."

5    Yes?  In the first line.

6    A.  The first line says --

7          THE COURT:  We are on the letter from Dr. Arroyo,

8    right?

9          MS. WILLIS:  Yes, your Honor, Defense Exhibit 3.

10   A.  Could you repeat your question?

11   Q.  He says, "I am in receipt of your letter requesting

12   information regarding Mr. Marmolejos"?

13   A.  Yes, that's what it says.

14   Q.  The next line says, "the patient," so presumably

15   Mr. Marmolejos, "is under my care in this mental health clinic

16   and has been in treatment since February 1, 2016"?

17   A.  Yes.

18   Q.  So this is a letter from 2018 that indicates there's been

19   ongoing and contemporaneous treatment up to February 8 of 2018?

20   A.  To me it does not indicate that.

21   Q.  But that is what it says?

22   A.  Well, I can explain why as a physician reading a medical

23   letter that's not what I take away from the letter.

24   Q.  OK.  Then moving on to Defense Exhibit 2, that is the

25   letter from the clinician, Felix Rodriguez?

1   A.  Right.

2   Q.  And that letter in the first line says, "Mr. German

3   Marmolejos has been a client at our agency since he was intaked

4   on December 9, 2015."  That's the first line.

5   A.  Yes.

6   Q.  Yes?  So that line also indicates that he continues to be

7   in treatment at that clinic?

8   A.  It depends on how you define treatment, which is -- well,

9   you know what, I can discuss and explain.  So I -- you know,

10  not clear to me from this letter that he's an active patient in

11  the clinic, but I can explain what I mean by active patient in

12  the clinic.

13  Q.  No.  Thank you.  I do have another question though.

14  A.  OK.

15  Q.  You indicated earlier you asked for the complete record

16  from St. Joseph's?

17  A.  I asked your legal team for a complete record.

18  Q.  Right.  So you sent an email request to both myself and

19  Assistant United States Attorney Michael Krouse on November 2,

20  2018 asking for additional information?

21  A.  That may be.  I would need to refer to the email.  My

22  recollection is that I did request it both in writing and in a

23  verbal conversation that you and I had in discussing your

24  client when I was first appointed in this matter.

25  Q.  And in that email, you specifically asked for full

1    psychiatric records from Dr. Arroyo's clinic, correct?

2    A.   Yes.  I believe I requested that either --

3    Q.   You also asked for contact information for Dr. Arroyo.

4    Yes?

5    A.   I'm sure that I did.

6    Q.   You asked for contact information from collateral sources,

7    particularly those that had been used in the mitigation

8    request?

9    A.   Yes.

10   Q.   Contact information from Mr. Marmolejos's boss?

11   A.   Right.

12   Q.   And you asked to have an additional appointment set up with

13   Mr. Marmolejos?

14   A.   An additional appointment?

15   Q.   You had met with him October 19.  You sent this letter --

16   email on November 2, and in that email you asked to set up

17   another evaluation session?

18   A.   Right.  Well -- so, the way I would -- what I would state

19   is that you and I spoke in October for 30 minutes on the phone,

20   and I made all those requests initially when we spoke on the

21   phone is my recollection.

22        As of November having met with him once for two hours,

23   I was not yet in receipt of that information and made an

24   additional request, and I would have to refer to the email,

25   specifically what was in the email, but it sounds to me like --

1    Q.  Why don't we refer to the email?

2    A.  Great.

3            (Pause)

4            MS. WILLIS:  If I may approach, your Honor?

5            THE COURT:  You may.

6    Q.  I'm handing you what I've marked as Defense Exhibit 4 for

7    identification.  I will hand up a copy in just a moment.

8    Dr. Cohen, what I have just handed you is an email sent from

9    you.  Yes?

10   A.  Yes.

11   Q.  It's sent from your email address which you recognize?

12   A.  Absolutely, this is an email from me.

13   Q.  It's sent on November 2, 2018 like we were just discussing?

14   A.  Absolutely.

15   Q.  And it's a message that you sent to myself and AUSA Krouse?

16   A.  Yes.

17   Q.  And in this letter, you specifically say that you had

18   discussed with me obtaining a full psychiatric record for

19   Dr. Arroyo's clinic?

20   A.  Yes.

21   Q.  You said that you wanted to speak to Dr. Arroyo and wanted

22   a signed HIPAA release from the defendant for that purpose?

23   A.  Yes.

24   Q.  That you would like to speak to collateral sources,

25   specifically individuals who had submitted information for the

1  mitigation submission?

2  A.  Absolutely.

3  Q.  And that you wanted to speak to the defendant's boss?

4  A.  Yes.

5  Q.  And that you would need to see the defendant again once

6  you've been able to review all of that information?

7  A.  Yes.

8  Q.  All right.  Thank you.

9         MS. WILLIS:  One moment, your Honor.

10  Q.  After that communication, my paralegal responded to you on

11  November 7 and sent you contact information for

12  Mr. Marmolejos's family, the two aunts and his partner?

13  A.  OK.

14  Q.  A copy of that email as well if you'd like to see it?

15  A.  Oh, yeah, OK.  So it's not in this transmittal.

16  Q.  No?

17  A.  That sounds plausible that she responded.

18  Q.  What we're going to do is I am going to show you --

19         (Pause)

20         MS. WILLIS:  Your Honor, if I may approach?

21         THE COURT:  You may.

22  Q.  I'm handing you what I've marked as Defense Exhibit 5 for

23  identification, and I have a copy for the Court.  Now I don't

24  have a copy.

25         (Pause)

1     THE COURT:  Can we proceed with the next question?

2     MS. WILLIS:  The government has my copy, your Honor.

3  Q.  So what I've handed you is a stream of email communications

4  between you and primarily Chiraagu Gosrani, a paralegal of my

5  office?

6  A.  OK.

7  Q.  You recognize that you are one of the recipients or sender

8  of some of these messages?

9  A.  Yeah.  I mean, we can walk through if there is any message

10 in particular that you want me to refer to, but this does

11 appear to be a packet of emails going back and forth between

12 your office and mine.

13 Q.  And you recognize your email as appearing in either the

14 send or receive section of these emails?

15 A.  Yes.

16     MS. WILLIS:  Your Honor, I would seek to admit Defense

17 Exhibit 5 just so we can more easily walk through it.

18     THE COURT:  And Defense Exhibit 4 as well?

19     MS. WILLIS:  Yes, your Honor.

20     THE COURT:  Any objection?

21     MR. NESSIM:  No.

22     THE COURT:  Admitted.

23     (Defendant's Exhibits 4 and 5 received in evidence)

24 Q.  We were previously talking about on November 2 you sent a

25 message to myself and AUSA Krouse requesting sort of additional

1    documents, some of which you may have asked for before,

2    correct?

3    A.   Right, we reviewed the email from November 2.  Well, it was

4    a follow-up, yes.

5    Q.   Right.  And then if you turn in the packet you have to

6    November 7, there is a message from Chriaagu Gosrani to you

7    providing you with contact information for some members of

8    Mr. Marmolejos's family?

9    A.   Which exhibit is this in now?

10   Q.   This is in Exhibit 5.

11             THE COURT:  I think page 7.

12   A.   Yes.  I see an email November 7 from Chiraagu Gosrani to me

13   with four names and telephone numbers.

14   Q.   And it also indicates that there is an attachment to that

15   particular message which is a HIPAA release from Mr. Marmolejos

16   so that you would be able to speak to Dr. Arroyo?

17   A.   Yes.

18   Q.   And then it also indicates that we'll follow-up with the

19   boss's information the next day?

20   A.   Yes.

21   Q.   And then there is a message, turning to the bottom of page

22   5, that is sent on November 13 from Chiraagu Gosrani to you

23   providing the contact information for Roberto Toledo, the

24   social worker who coordinated Mr. Marmolejos's employment?

25   A.   On page 5.

1    Q.   The bottom of page 5 on to the top of page 6?

2    A.   Yes, I see that email from the 13th.

3    Q.   You then sent a follow-up message on November 20 again

4    asking for the full psychiatric chart for Mr. Marmolejos.

5    That's on page 5, the top.

6    A.   Yes, I sent another follow-up email asking if the record

7    had been obtained yet.

8    Q.   On page 4, I sent you a response that said we haven't

9    obtained it.  We sent all of the required releases and we're

10   still working on getting it from them?

11   A.   Right.  Your paralegal was on vacation and that you would

12   follow up with the clinic on Monday.

13   Q.   And then finally on November 26, we sent a message saying -

14   this was from Chiraagu Gosrani to you - that after his

15   follow-up, we finally received the records from St. Joseph's,

16   and they were attached to that message?

17   A.   Right.

18   Q.   OK?  And it's after you received that that you then said on

19   page 2 on December 8, "Thank you for sending these" and that

20   now you'd like to schedule the follow-up appointment with

21   Mr. Marmolejos, correct?

22   A.   Correct.

23   Q.   The records that were sent to you --

24            MS. WILLIS:  Your Honor, if I may approach?

25            THE COURT:  You may.

1          MS. WILLIS:  First, we skipped this one.

2     Q.  I'm handing you what I marked as Defense Exhibit 6 for

3     identification.  This was provided to the Court and to opposing

4     counsel in advance.

5          That document you received with the original records

6     from St. Joseph's, correct?

7     A.  I believe I did, yes.

8     Q.  And that is essentially a medication profile showing dates

9     where Mr. Marmolejos was given additional prescription of

10    Seroquel?

11    A.  Right, and this is one of the reasons why I felt that he

12    was not an active patient, but yes.  Yes.

13         THE COURT:  Can you explain what you mean by "active

14    patient"?

15         THE WITNESS:  So, when someone is at a mental health

16    clinic, there are lots of individuals who, you know, flow

17    through a clinic.  There's a little bit of a revolving door in

18    clinics, and clinics don't typically close charts.  So even if

19    someone is only going infrequently to the clinic, they remain

20    technically an active patient.

21         And one of the things that was concerning to me when I

22    reviewed this was that – this is Exhibit 6 – is that you can

23    see five visits in 2016 which indicate some frequency of

24    attendance, although less than once a month, which someone with

25    schizophrenia would be expected to go more frequently.  But of

1    concern was that I only see one prescription in all of 2017,

2    and one prescription in the beginning of 2018.  I received

3    this, I suppose, in November or December.  We were just going

4    through the emails, so that to me indicated that he really

5    might not be an active patient or does not appear to be an

6    active patient and does not appear to be receiving regular

7    prescriptions.

8    Q.  To clarify, that document you received from initial

9    evaluation from Dr. Arroyo was dated electronically signed on

10   February of 2016?

11   A.  That could not be the -- I don't remember whether it was

12   then or later, but that was my analysis of this document.

13              MS. WILLIS:  Your Honor, if I could approach again?

14              THE COURT:  Are you offering Defense Exhibit 6?

15              MS. WILLIS:  Yes, I am, your Honor.  Thank you.

16              THE COURT:  That's the handwritten medical chart?

17              MS. WILLIS:  Yes.

18              THE COURT:  Any objection?

19              MR. NESSIM:  I'm just not clear on what it is.

20              THE COURT:  I think it's labeled at the top,

21   Department of Psychiatry Ambulatory Medication Record.  Is that

22   correct, Dr. Cohen?

23              MR. NESSIM:  No objection.

24              THE COURT:  Dr. Cohen, is that correct?

25              THE WITNESS:  Are we referring to Exhibit 6?

1      THE COURT:  Yes, Department of Psychiatry Ambulatory

2  Medication Record.

3      THE WITNESS:  Yes, that's what I see as well.

4      THE COURT:  Admitted without objection.

5      (Defendant's Exhibit 6 received in evidence)

6  Q.  Now, I'm handing you what is marked Defense Exhibit 7 for

7  identification.  This was also previously provided to the Court

8  and also provided to opposing counsel.

9      THE COURT:  Ms. Willis, it would definitely be easier

10  in the future to have marked versions of these so everybody is

11  literally on the same page.  I take it -- I don't want to take

12  anything.  Let's find out what this is, and then I'll confirm

13  how I received it.  Go ahead.

14  Q.  The documents I've just handed you are the additional

15  records from St. Joseph's that you received on November 20,

16  2018?

17  A.  If you'll allow me a minute to just familiarize myself, I

18  can answer that question.  Yes, this is the record from his

19  treatment with Dr. Arroyo.

20  Q.  I'm sorry, go ahead.

21  A.  No, no, that's fine.  That's my answer.

22  Q.  Now, you received these records November 20, 2018 prior to

23  your second meeting with Mr. Marmolejos, which was in December?

24  A.  Yes.

25  Q.  You don't make any reference whatsoever to these records in

1   your report.  Specifically turning to page 1 where you list

2   sources medical, you do not list -- you list history and

3   physical from Arroyo from February of 2016, the letter from

4   February of 2018, and the letter from Fernandez -- excuse me --

5   Rodriguez from 2018.  That's what you list for medical sources.

6   Yes?

7   A.  That is what I list in my report.

8   Q.  And you do not list under medical sources these additional

9   records from St. Joseph's, correct?

10  A.  Yes, I neglected to include that in my list of sources.

11  Q.  And in these additional records from St. Joseph's there are

12  clearly records dating back to 2016, the very last pages of the

13  document.  The second to last page has a note dated May 17,

14  2016.  Yes?

15  A.  Correct.

16  Q.  And then the front record, and by that, the first several

17  pages are just sort of fax cover sheets.  Do you see that?

18  A.  Mmm-hmm.

19  Q.  And the first document that says medication management

20  progress note is dated September 19, 2018, correct?

21          THE COURT:  Ms. Willis, do you want to offer this?

22          MS. WILLIS:  I do, your Honor.  Thank you.

23          THE COURT:  Any objection?

24          MR. NESSIM:  No, your Honor.

25          THE COURT:  Just so I am clear, I have a 43-page

document, the first page of which is some sort of notice with

attention confidential information enclosed and the last page

is the record that you just reference.  Is that what I should

be looking at?

          MS. WILLIS:  That is correct, your Honor.  That is the

document we are looking at.

          THE COURT:  Defense Exhibit 7 is admitted.

          (Defendant's Exhibit 7 received in evidence)

A.  Can you repeat the question, the last question?

Q.  Yes.  After the first several pages, which are, as the

Court indicated, there's a confidential information attention

form, and then there are some fax cover sheets.  So after

several of those, there is then a document that says medication

management progress note, and it is dated September 19, 2018.

The very first one after the fax transmittal sheets, that's the

page I'm asking you about.

A.  Umm, yeah.

          THE COURT:  It seems to be page 7 of the exhibit.

A.  I have January 8.  Oh, the top of the --

Q.  That is not the one we sent.  I'm sorry, if I could check--

A.  Here the date is September, but...

Q.  Right.  So I'm asking you about September.

A.  Right, but...

Q.  You see the medication management progress note dated

September 19, 2018, and it says 1 of 9?

1    A.  Right.  I'm just trying to look at the date here.  It seems

2    to be September 19.  There are just a few different dates on

3    the note, which is not unusual for medical records.  I just

4    wanted to be clear that it was the 19th.

5    Q.  Just so we're all on the same page, there is a box at the

6    very top.  Yes?

7    A.  Yes, so that --

8    Q.  It has Mr. Marmolejos's name in it.  Yes?

9    A.  Correct.

10   Q.  It then has some type of case identifying number.  Yes?

11   A.  Right.

12   Q.  And then in the far right corner of that box, it says page

13   1 of 9.  Yes?

14   A.  Yes.

15   Q.  And beneath that, it says date 9/19/2018?

16   A.  Right, but there is also a date that says it was printed in

17   October and at the end of the note there's a begin date

18   January 8.

19          THE COURT:  I think we just want to make sure we're on

20   the same document.

21          We're squared away with that.  Let's go to the next

22   question, please.

23   Q.  That is correct.  Then it says it is a medication

24   management progress note, correct?

25   A.  Correct.

1    Q.  So this stack of records which was provided to you before

2    you met with Mr. Marmolejos a second time, which certainly

3    shows there is some ongoing contact between him and St.

4    Joseph's from 2016 all the way up to November 19 of 2018, yes?

5    A.  Yes, what I would describe as intermittent contact.

6    Q.  There is some ongoing contact between him and St. Joseph's,

7    correct?

8    A.  Yes.

9    Q.  And in the meeting on September 19, 2018, Dr. Arroyo notes

10   in his records that there has been a change in Mr. Marmolejos's

11   presentation?

12   A.  In the note from September?

13   Q.  Yes.  Going to page 2, 2 of 9 of that same document we have

14   been talking about.

15   A.  OK.

16   Q.  He indicates that his rapport is distant?

17   A.  Page of 2 of 9, rapport distant.  OK.

18   Q.  So that's a yes?

19   A.  Yes.  He checked the box distant.

20   Q.  He indicates in the section under affect about four or five

21   sections down that his affect is blunted?  All the way to the

22   right.

23   A.  Yes.

24   Q.  He indicates his speech his coherent, but it is also soft?

25   A.  Right, coherent and soft.

1    Q.  He indicates under psychosis that he is experiencing -- he

2    checks the box marked auditory?

3    A.  Right.

4    Q.  And on the next page 3 of 9 about two-thirds of the way

5    down, it says psychiatric condition is generally, and there are

6    options:  Improving, unchanged, or deteriorating.  Yes?

7    A.  Yes.

8    Q.  And he checked the box deteriorating?

9    A.  He did.

10   Q.  And then the next two sections down, it says, "plan."  And

11   in the box underneath plan, it says, "patient to start on a

12   higher dose of Seroquel XR 300 milligrams HS," which refers to

13   nightly, correct?

14   A.  Which refers to what?

15   Q.  Nightly?

16   A.  Yeah, correct, at night.

17   Q.  So a change in his medication was made in September 19 of

18   2018?

19   A.  Yeah, the dosage was increased.

20   Q.  And the dosage was increased because his psychiatric

21   condition was deteriorating at that time per his psychiatrist?

22   A.  Yes.

23   Q.  You don't make any reference in your report to the fact

24   that there was a change in Mr. Marmolejos's medication?

25   A.  I don't believe I reference it in my report, that's

1    correct.

2    Q.  I want to back up for a moment and talk about some

3    behaviors that you say you observed on the part of

4    Mr. Marmolejos during your interviews with him, behaviors that

5    you described as unusual.

6            You indicate broadly that he was not cooperative with

7    you.

8    A.  Right.

9    Q.  I think several times in your report you describe that he

10   was not cooperative.  He just sort of wasn't answering your

11   questions, correct?

12   A.  I don't -- I mean, I described in some detail various ways

13   in which he did not directly answer questions, and I do

14   describe he was uncooperative, yes.

15   Q.  So you use the words uncooperative or non-cooperative

16   several times in your report.  Is that correct?

17   A.  I don't remember how many times it was in my report, but I

18   do agree with that, that I found him to be uncooperative or

19   non-cooperative.

20   Q.  Described him as having no spontaneous speech.  Sort of

21   everything has to be prompted by you, correct?

22   A.  Yes.  Yes, I described -- I mean, I don't know that I said

23   everything has to be prompted by me, but I said he was not

24   spontaneous, and, yes, I had to ask him questions repeatedly

25   and rephrase them and wait for long periods of time for him to

1    answer a question.

2    Q.  Let's specifically look at page 3 of your report.  Do you

3    have that?  This is Government Exhibit 1.

4    A.  Yes, page 3.

5    Q.  There's a section marked psychiatric interview on page 3?

6    A.  This is Exhibit 2.

7            THE COURT:  I think it's Government Exhibit 2,

8    actually.

9    Q.  Government Exhibit 2, your report.  Yes?

10   A.  Yes, my report.

11   Q.  Page 3 of your report, there's a section marked Psychiatric

12   Interview?

13   A.  Right.

14   Q.  And in the second paragraph of psychiatric interview, you

15   say that Mr. Marmolejos appeared to be non-cooperative?

16   A.  Right.

17   Q.  And then about midway through the paragraph, you say,

18   "Furthermore, Mr. Marmolejos made no spontaneous

19   communications"?

20   A.  Yes.

21           THE COURT:  Can you hold on one second, Counsel.

22           (Pause)

23           THE COURT:  People cleaning the windows outside, and

24   one of them seems to be singing as he goes by, but I think that

25   has passed.  So let's continue.

1    BY MS. WILLIS:

2    Q.  So midway through that same paragraph, you say,

3    "Furthermore, Mr. Marmolejos made no spontaneous

4    communications."  Yes?

5    A.  Yes.

6    Q.  You said that he simply sat silently?

7    A.  Right.

8    Q.  And then you say same paragraph, "This kind of behavior is

9    unusual even in persons with severe mental illness or mental

10   retardation."

11   A.  Right.

12   Q.  I'm sorry.  I'm going to read the sentence again.  "This

13   kind of behavior is unusual in that even persons with severe

14   mental illness or mental retardation will make spontaneous

15   communications.  For example, greet the examiner, or ask a

16   question or tell a story."  That's in your report?

17   A.  Yes.

18   Q.  And you say that this behavior is -- was, in your opinion,

19   unusual?

20   A.  I do say that.

21   Q.  I want to talk a little bit next about the symptoms of

22   schizophrenia.  Actually, I'm sorry, I left one thing out about

23   Defense Exhibit number 7.  Throughout those additional records

24   that you were provided, Dr. Arroyo continues to diagnose

25   Mr. Marmolejos with schizophrenia, correct?

1    A.  Yes, that's the diagnosis on the subsequent notes.  That's

2    the only diagnosis on the subsequent notes.

3    Q.  So not only was the diagnosis schizophrenia back in

4    February of 2016, the diagnosis remained that through September

5    at least of 2018, correct?

6    A.  Yes.

7    Q.  Yes.  OK.  So schizophrenia is a chronic psychological

8    disorder?

9    A.  I would consider it a psychiatric disorder.

10   Q.  It can affect people's thoughts, feelings and behaviors?

11   A.  That's fair.

12   Q.  And schizophrenia can have symptoms that are categorized as

13   either positive or negative symptoms of schizophrenia?

14   A.  That's true.

15   Q.  A positive symptom of schizophrenia is one that is adding a

16   feeling or behavior that isn't typically seen sort of in the

17   regular population, correct?

18   A.  That's correct.

19   Q.  And so you -- an example of a positive symptom of

20   schizophrenia would be hallucinations or delusions which you

21   talked about earlier?

22   A.  Well, what I was talking about earlier is that those

23   could -- a hallucination may indicate psychosis.

24   Q.  So that is an example of a symptom of schizophrenia.  It

25   doesn't mean everybody with hallucinations have schizophrenia

1    or that you all schizophrenics have hallucinations, but it is a

2    symptom of schizophrenia, right?

3    A.   Exactly.

4    Q.   So when someone is experiencing positive symptoms of

5    schizophrenia, that is what you refer to as a break with

6    reality, and that's what you call psychosis, correct?

7    A.   No.  What I would say is that psychosis is not

8    characterized only by positive symptoms.

9    Q.   Let's talk about the other types of symptoms of

10   schizophrenia.  There are also negative symptoms of

11   schizophrenia?

12   A.   That can be the case, yes.

13   Q.   And negative symptoms of schizophrenia are when it's a

14   symptom that is taking away a feeling or behavior that normally

15   would be present in somebody without schizophrenia?

16   A.   OK.  I mean, that's a fair enough description.

17   Q.   Now, from the records that you had from St. Joseph's,

18   you're aware that Mr. Marmolejos had a history of auditory

19   hallucinations?

20   A.   I was aware it is indicated in the note that he was hearing

21   voices, primarily of his deceased grandfather.  So yes, I was

22   aware of that.

23   Q.   And also of the Virgin Mary?

24   A.   Yes, that was indicated.

25   Q.   And those were specifically described by Dr. Arroyo as

1    being auditory hallucinations?

2    A.   Yes, they were.

3    Q.   OK.  And you're aware that Mr. Marmolejos also had a

4    history of sort of delusions of persecution, the belief that

5    someone or something is sort of out to get him?

6    A.   I think that -- what I guess I want to make a distinction

7    here is between - if I may - is between what he is reporting

8    and the assessment of what he's reporting.  So I believe that

9    he reported - well, we can refer to the note - being on edge

10   and feeling suspicious of others.  And then the question is

11   whether that's a delusion or not.  And we can refer to the note

12   about, I'm not sure that he really -- Dr. Arroyo really said

13   that they were delusions, but that would be an assessment of

14   what Mr. Marmolejos had stated.  So I think that's an important

15   distinction to make.

16   Q.   You're also aware that he had a history of thought

17   broadcasting, and Dr. Arroyo mentioned that in his 2016

18   evaluation, correct?

19   A.   Correct.

20   Q.   And thought broadcasting is sort of the belief that your

21   thoughts aren't private in your head.  You believe other people

22   or things might be able to read them or intercept them?

23   A.   I think that's a fair description of thought broadcasting.

24   Q.   And those are all positive symptoms of schizophrenia?

25   A.   So, like we were saying with auditory hallucination, yes,

1    they may represent symptoms of schizophrenia.

2    Q.  And we talked about there are also negative symptoms of

3    schizophrenia, correct?

4    A.  Schizophrenia may have negative symptoms, yes.

5    Q.  And, generally speaking, there's about seven negative

6    symptoms of schizophrenia?

7    A.  There's a number of negative symptoms, sure.

8    Q.  And the DSM V specifically lists some of the negative

9    symptoms of schizophrenia?

10   A.  I'm sure it does.

11   Q.  And some of the negative symptoms of schizophrenia that it

12   lists are diminished emotional expression and avolition,

13   A-V-O-L-I-T-I-O-N, which I may not be pronouncing correctly.

14   A.  Sure.  Yes, those are examples.

15   Q.  And avolition or avolition is a lack of motivation or an

16   inability to follow goal-oriented action?

17   A.  Yeah, I think it's avolition.

18   Q.  Avolition, OK.

19           Another negative symptom of schizophrenia is

20   diminished emotional expression, which includes reduction in

21   the expression of emotions in the face, eye contact, and

22   intonation of speech?

23   A.  Yes.

24   Q.  Correct?

25   A.  Yes.

1    Q.  The DSM V also lists for negative symptoms of schizophrenia

2    that the individual may sit for long periods of time and show

3    little interest in participating in work or social activities?

4    A.  That -- I'm sure that's what the DSM says.

5    Q.  It also lists alogia?

6    A.  Alogia.

7    Q.  Close, yes.  A-L-O-G-I-A.  Alogia.  And alogia could be a

8    complete lack of speech; it's the inability to speak, correct?

9    Just the word, the meaning of the word?

10   A.  No, that's what -- I wouldn't consider it a complete lack

11   of speech or inability to speak.

12   Q.  In the context of schizophrenia, it normally refers to

13   poverty of speech, correct?

14   A.  Yes, that's a better description.

15   Q.  Diminished speech output?

16   A.  Yes.

17   Q.  And that could be a lack of someone -- a lack of providing

18   additional unprompted content that you would normally see in

19   regular speech, correct?

20   A.  Right, and it would not be selective.  It would be global.

21   Q.  The point is that's what alogia means, correct?

22   A.  It's a global impoverishment of speech.  That's very

23   important.  Not a selective impoverishment of speech.

24   Q.  Another negative symptoms of schizophrenia can be

25   asociality.

1   A.  Yes.  People with schizophrenia can withdraw socially.  So,

2   for example, they stop working.

3   Q.  There can also be difficulty paying attention and attention

4   flattening?

5   A.  Sure.  They can be distracted by their psychological

6   psychiatric symptoms.

7   Q.  When someone's speech is described as low in rate, that

8   would mean that it's not -- the words aren't coming quickly,

9   correct, that the rate or the speed at which they are speaking

10  is slow?

11  A.  I think that's reasonable.  Speech that's slow in rate

12  means that it's a slowed-down speech.

13  Q.  And even in Mr. Marmolejos's first evaluation with

14  Dr. Arroyo, Defense Exhibit 1, Dr. Arroyo describes that on

15  page 2 of his report that Mr. Marmolejos is cooperative but

16  appears somewhat sullen and that his speech is low in volume

17  and rate.  Correct?

18  A.  This is Exhibit number 1.

19  Q.  Exhibit number 1, page 2.

20  A.  This is under mental status examination?

21  Q.  Correct.

22  A.  So it says, "his speech his low in volume and rate,

23  otherwise coherent."

24  Q.  He also says that "He is cooperative though appears

25  somewhat sullen"?

1    A.  Where in the paragraph do you see that?

2    Q.  It's two sentences before the sentence you just read.

3    A.  Further up?

4    Q.  Yes.

5    A.  Yes.  "He's cooperative though appears somewhat sullen."

6    Q.  Schizophrenia, you said, is a condition where the symptoms

7    can wax and wane.  I believe that was your term.

8    A.  Yes, that's true.

9    Q.  Someone can become more symptomatic or they could become

10   less symptomatic?

11   A.  That is true.

12   Q.  That might be in response to treatment and medication?

13   A.  Yes.

14   Q.  Might be in response to sort of pressures in the

15   environment?

16   A.  Sure.

17   Q.  Or there might be cases where someone's symptoms just sort

18   of wax and wane without a discernible reason?

19   A.  That is true.

20   Q.  Now, you said that cognitive symptoms are more -- by

21   cognitive, I mean cognitive disabilities, are more static?

22   A.  In what context?

23   Q.  They're not going to wax and wane.

24   A.  But when you say cognitive -- please repeat the question?

25   Q.  Cognitive disabilities --

1    A.   Mmm-hmm.

2    Q.   -- are more static?

3    A.   I believe I said that intellectual disability is a stable

4    condition, so I would expect it to not wax and wane, yes.

5    Q.   Now, if someone had an intellectual disability and a mental

6    illness of some type, those two things could interact with each

7    other?

8    A.   Could you be more specific by what you mean by "interact

9    with each other"?

10   Q.   If someone has schizophrenia, for example, and entered a

11   period of psychosis, that could be exacerbated by the fact that

12   they also have cognitive limitations or intellectual

13   disabilities?

14   A.   No, I don't -- I don't see that connection.

15   Q.   Let me be more broad.  One condition can affect the other?

16   A.   I think that's too broad, but in that phrase I would say

17   no.  I mean, they're independent conditions.  They don't affect

18   each other.  Intellectual disability does not affect the course

19   of schizophrenia nor does schizophrenia affect the course of

20   intellectual disability.  They are distinct.

21   Q.   Well, let's talk about schizophrenia and intellectual

22   disability.  A core feature of schizophrenia is cognitive

23   dysfunction.  Yes?

24   A.   What I would say is that the cognitive difficulties that

25   you see in schizophrenia -- yes, you see cognitive difficulties

1   in schizophrenia.  They're very different from the cognitive

2   difficulties that you would see with someone with an

3   intellectual disability.  And I'm happy to explain more about

4   that.

5   Q.  So the answer to my question is yes?

6   A.  Yes, you can see cognitive symptoms in schizophrenia.

7   Q.  And, in fact, per the DSM V, cognitive deficits in

8   schizophrenia are common and are strongly linked to vocational

9   and functional impairments?

10  A.  That's true.

11  Q.  And schizophrenia itself can affect working memory?

12  A.  Yeah, in subtle ways.  Yes, in subtle ways it can affect

13  working memory.

14  Q.  And specifically per the DSM V, these deficits, cognitive

15  deficits can include decrements in declarative memory, working

16  memory, language function and other executive functions as well

17  as slower processing speed?

18  A.  These are very subtle changes that happen, not that would

19  be picked up on a Folstein examination, for example.

20  Q.  We'll get to the Folstein examination, but the answer to my

21  question is yes, that's what the DSM V says about effects that

22  schizophrenia can have on cognitive function.  Yes?

23  A.  Yes, it can have effects on cognitive function.

24  Q.  It can also affect attention?

25  A.  Yes.

1  Q.  It can cause social cognitive deficits as well?

2  A.  Sure.

3  Q.  It may cause an inability to infer the intentions of

4  others?  Let me ask it this way:  Per the DSM V, "Some

5  individuals with schizophrenia show social cognitive deficits

6  including deficits in the ability to infer the intentions of

7  others (theory of mind) and may attend to or interpret

8  irrelevant events or stimuli as meaningful, perhaps leading to

9  the generation of explanatory delusions."  That's what the

10  DSM V says, correct?

11  A.  That is what the DSM V says, yes.

12  Q.  So when I say that schizophrenia may cause an inability to

13  infer the intentions of others, the answer is yes?

14  A.  The answer --

15  Q.  I could read it again from the book, but the answer is yes,

16  correct?

17  A.  The answer -- I would agree with what the DSM said, yes.

18  Q.  Now, you just talked about the Folstein test, you called

19  it, correct?

20  A.  Yes, we talked about that.

21  Q.  And Folstein is a -- the other name for it is mini-mental

22  state exam, MMSE?

23  A.  That's true.

24  Q.  Now, before we get to Folstein, let's talk about

25  psychological testing broadly, just so we have some context.

1          Psychological or psychiatric testing isn't a single

2     test.  There is not one test for psychological or psychiatric

3     function, right?

4     A.  There are many tests, exactly.

5     Q.  There are many tests?

6     A.  Right.

7     Q.  And there are many different types of tests, tests that are

8     testing for different things?

9     A.  That's true.

10    Q.  There's tests for intellectual functioning?

11    A.  Well, I think the tests overlap a lot, so obviously all the

12    tests are touching on intellectual functioning, but -- yeah.

13    Q.  There's tests for sort of personality testing?

14    A.  Right, that's a different domain.  Yes.

15    Q.  Behavioral testing?

16    A.  Sure.

17    Q.  Testing for adaptive behavior, which I believe you

18    referenced earlier?

19    A.  Yes.

20    Q.  And in order for a test to -- the tests that are used are

21    research backed, correct?  Maybe it would be easier if I

22    explain what I mean by that.  There are procedures for

23    administering a test?

24    A.  Sure.

25    Q.  There's procedures for how you score a test?

1   A.   Sure.

2   Q.   Some tests, for example, might be subjectively scored?

3   A.   I think we're leaving the domain of cognitive testing if

4   you're talking about subjective scoring.

5   Q.   I'm talking about psychological testing generally first.

6   A.   Psychological testing, but that's not testing -- testing of

7   intellectual function.  OK, I think I'm losing the thread here

8   a little bit.  If you're talking about psychological testing

9   broadly --

10  Q.   Yes.

11  A.   -- that is not specifically for intellectual functioning.

12  Then there are psychological tests that have a subjective

13  component, which means the evaluator is rendering an opinion as

14  part of the test.

15  Q.   There are tests that are norm referenced, meaning you score

16  it comparing the test-taker to other people who have taken the

17  test?

18  A.   Yes, that's true.

19  Q.   And when I mentioned earlier research backed, there is

20  research supporting the legitimacy and the reliability of the

21  psychological tests that are administered?

22  A.   So I think your statement is too broad.  There -- most

23  psychological tests -- for most psychological tests there is

24  research that is looking at the application of that test to

25  specific populations in specific contexts.

1    Q.  So when you say specific populations, let me stop you a

2    moment so we can talk about that more and move on.

3    A.  Sure.

4    Q.  So, for example, a test that was designed or normed for

5    intellectual functioning of adults would not be appropriate in

6    someone under ten?

7    A.  No, not necessarily.  So what I was going to explain is

8    that these tests are -- some tests are -- some tests are

9    normed.  Some tests are not.  Whether they are normed or not,

10   tests can be researched in specific populations.  And we can go

11   into what it means to norm a test, but I believe the statement

12   is a little too broad.

13          But if a test is normed on a specific population, it

14   may still be applied to other populations.  And some tests are

15   not normed; they are just applied in a research context.

16          And with all that having been said, tests may be

17   administered in a variety of settings for a variety of reasons.

18   So I don't think that there are hard and fast rules the way you

19   are -- I don't know if that's what you're implying, but I don't

20   think there are necessarily hard and fast rules, but there is

21   some guidance.

22   Q.  There is certainly best practice guidance?

23   A.  For certain tests; not for all tests.

24   Q.  There's certainly standards about how a test should be

25   administered so that there's some sort of uniformity in the

1    setup for how a test is being given?

2    A.   Sure.  That's part of the test, absolutely.

3    Q.   Now, when you talked about -- back to Folstein.  The

4    mini-mental state exam was originally designed by Dr. Folstein,

5    that's why it's the Folstein test.  Yes?

6    A.   Sure.

7    Q.   It was created in 1975?

8    A.   That sounds about right.  I think it's from the Seventies.

9    Q.   And the initial purpose of this exam was to assist sort of

10   treating doctors in the evaluation of cognitive impairments in

11   older adults like dementia and Alzheimer's and the like?

12   A.   That may have been the case.

13   Q.   This is a shortest that can be given in about five to ten

14   minutes?

15   A.   That's true.

16   Q.   It's often used in a hospital -- a medical treating

17   hospital setting?

18   A.   It's used in many settings.

19   Q.   But it is often used in a medical hospital setting?

20   A.   It's used in many settings.  I would include hospitals,

21   clinics, private offices.  It's used in many settings.

22   Q.   And it is a sort of quick way to -- before I say that, it

23   can be scored sort of almost immediately.  Some tests need to

24   be scored with a lengthy process to sort of calculate the score

25   on the test.

1    A.  It is a test that you score upon completion of the test in

2    the office.

3    Q.  So it is meant to be something that is short that can be

4    quickly administered and quickly scored?

5    A.  I don't agree with that.  You can take as much time as you

6    need for the test, and you often do take time with this test to

7    make sure that you're giving the person an opportunity to

8    answer the questions, and some people have more difficulty with

9    the test than others, so I wouldn't -- I wouldn't characterize

10   it in that way.

11   Q.  Let me just clarify one thing.  We keep referring to it as

12   a test.  This is actually a screener, correct?

13   A.  I don't think there is a distinction between a screen and a

14   test with regard to this test or other psychological tests.

15   Q.  Well, some tests for intellectual disability, you perform

16   the test, and that with collateral sources in an interview can

17   be used to diagnose an intellectual disability.  The Folstein

18   exam is not designed to be used in that way?

19   A.  I don't agree with that statement.

20   Q.  Well, it's a screener that lets the doctor know whether

21   more testing is needed?

22   A.  I don't agree with that statement either.  I would simply

23   say the Folstein mini-mental status exam gives a window into

24   looking at a person's cognitive status at that moment when

25   they're in your office, and that information can be used in a

1   variety of purposes.  And this test has been around since the

2   Seventies, so it's been used on thousands and thousands of

3   patients and researched in many different contexts.

4   Q.  Sure.  So it's a window into their current functioning.  It

5   is not a full test for intellectual disability on its own?

6   A.  There is no full test for intellectual disability on its

7   own.  That's what I've testified to.

8   Q.  What it's also not a test for is a test for malingering,

9   correct?

10  A.  It can be used in the assessment of malingering, as can

11  most tests.

12  Q.  There are specific tests that are designed to test for

13  malingering, correct?

14  A.  There are some psychological tests that are in a more

15  subtle way meant to trip up the individual and catch

16  inconsistencies in their answers.

17  Q.  And when scoring those tests, a score below a certain

18  number would have sort of research evidence backed information

19  to say this is an indicator of malingering, correct?

20  A.  No, I wouldn't agree with the research-backed statement of

21  that because it gets into very complicated issues of what you

22  use as a cutoff for malingering, and we can get into that in a

23  lot of detail if you'd like.

24  Q.  The Folstein test is not designed, again, to test for

25  malingering, and it's not designed to test for effort, correct?

A.  No, I don't agree with those statements.

Q.  I want to be clear about your report.  The Folstein

mini-mental state exam is the only formal test or exam that you

gave to Mr. Marmolejos, correct?

A.  It's the only -- I would say both examinations were formal

examinations.  So I don't know what you mean by the term

formal, but this was a cognitive test, an established cognitive

test that was administered to him.

Q.  And to be clear, that's the only established cognitive

test -- I know you asked other questions.

A.  No, it's not the only established cognitive test because

the entire interview is a very formalized procedure for

assessing his cognition and his behavior, so I wouldn't agree

with that.

          THE COURT:  Ms. Willis, I should probably break for my

1:00 meeting.  I have been advised it should only take a half

hour.  So let's plan to pick up again at 1:40.

          Can we talk about schedule and how long you anticipate

this going and where we're going thereafter?

          MS. WILLIS:  I don't know the timing, your Honor.  I

do have several more sheets of questions.  I don't if that's

any kind of guidance.  It probably isn't.

          THE COURT:  How many sheets have you been through?

          MS. WILLIS:  That's an excellent question, your Honor.

It looks like I've been through about 11 or 12, your Honor.

1          THE COURT:  And then you have your own witness?

2          MS. WILLIS:  Yes.

3          THE COURT:  OK.  Well, I'm going to try and figure out

4     my afternoon, but for your planning purposes, I do have a

5     sentencing in a violation proceeding at 3:00 and then a plea at

6     3:30.  I may try and move those around, but it is going to

7     impact a little bit on our afternoon, and we'll take it as it

8     comes, I guess.

9          MS. WILLIS:  I would think I certainly before those

10    events happen -- I'm guessing here, but I anticipate I would be

11    finished with my cross-examination certainly of Dr. Cohen, if

12    that's an hour or so.

13         THE COURT:  Any guess on how long your direct of

14    Dr. Fernandez will be?

15         MS. WILLIS:  No.

16         THE COURT:  Why don't you try and figure that out, and

17    let me know when we resume.

18         Dr. Cohen, I know you're court appointed, but to the

19    extent you've been called as a witness by the government and

20    you're on cross-examination, as you may know, you're not

21    supposed to communicate with counsel for the government.  So

22    I'd ask you not to speak with them during your break, and if

23    you could be back here and on the stand at 1:40 for us to go,

24    that would be great.

25         Anything we need to address in the meantime?

J43QMAR2                           Cohen - Cross

1             MS. WILLIS:  No, your Honor.

2             MR. NESSIM:  No, your Honor.

3             THE COURT:  I'll see you at 1:40.  Thanks.

4             (Luncheon recess)

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J43QMAR2                          Cohen - Cross

1                          AFTERNOON SESSION

2                              1:45 p.m.

3              THE COURT:  Dr. Cohen, you remain under oath.  We will

4      continue with cross-examination.

5              For the record and going forward, since you all have

6      dealings with me on a regular basis, if I say 1:40, I mean

7      1:40.

8              MR. FLOOD:  We lost track of time.  My apologies.

9              THE COURT:  What I'm telling you is going forward

10     don't let that happen.

11             Let's proceed.

12     ZIV COHEN, resumed.

13     BY MS. WILLIS:

14     Q.  Dr. Cohen, I just wanted to clarify a couple points about

15     when and how you administered the Folstein just for clarity.

16     Was it on the first meeting with Mr. Marmolejos or the second?

17     A.  It was on the first meeting.

18     Q.  So in that first meeting his partner was not present.  It

19     was just you, the interpreter and Mr. Marmolejos?

20     A.  That's correct.

21     Q.  And you read the questions to him?

22     A.  I administered the exam.  It's an exam where you give the

23     person tasks, I would say.  There are some questions, but

24     you're also giving them tasks.  So that's what I did, yes.

25     Q.  And then both the questions and I guess the instructions

1   for the tasks would have then been translated for him?

2   A.   That's correct.

3   Q.   Thank you.  I want to ask you some questions about

4   Mr. Marmolejos's driving and having a driver's license, OK?

5   A.   OK.

6   Q.   You listed a number of things about that that you found

7   significant, and one of them was that in order to obtain a

8   driver's license, he would have had to take a test?

9   A.   Right.

10  Q.   And in terms of that test, you don't know where he got his

11  driver's license, what state or country.  Fair to say?

12  A.   I believe he carried a driver -- a New Jersey driver's

13  license.

14  Q.   Let me clarify.  When someone gets a driver's license, you

15  could, you know, get it in one state.  If later you moved, you

16  would be able to get a driver's license in another state

17  without perhaps taking a test again?

18              MR. NESSIM:  Objection.

19              THE COURT:  The witness can answer if he knows.

20  A.   I don't know.

21  Q.   So your understanding is that he currently has a driver's

22  license for the State of New Jersey?

23  A.   You know, I don't know for sure if it's New York or New

24  Jersey, but I believe it was New Jersey.

25  Q.   But you don't know when he first obtained a driver's

1   license, like the date, the year?

2   A.  Yeah, he wouldn't answer that question, so I don't know.

3   Q.  And you don't know if he first obtained a driver's license

4   someplace other than New York or New Jersey?

5   A.  Again, he wouldn't answer that question, so I don't know.

6   Q.  You don't know.  Once someone, if you know, first obtains a

7   driver's license, to renew it, typically you can sort of renew

8   by mail or you don't have to take another examination?

9   A.  At some point you have to take a test to get a driver's

10  license, so -- I'm not an expert, and I can't really answer

11  questions about how you renew drivers' licenses, so I don't

12  know if that answers your question.

13  Q.  When you talk about the test that he must have taken to

14  obtain a driver's license, you don't know if that test was

15  handwritten or on a computer?

16  A.  No, I don't.

17  Q.  You don't know how many times he might have taken that test

18  before finally passing?

19  A.  No.

20          MS. WILLIS:  One second, your Honor.

21          (Pause)

22  Q.  I sort of have to back up and ask one more thing first

23  before I can finish about drivers' licenses.

24          We talked before about sort of symptoms generally of

25  schizophrenia.  Schizophrenia typically manifests when someone

1    is maybe anywhere from 16 to 30.  Is that accurate?

2    A.  No, I wouldn't agree with that.

3    Q.  Schizophrenia is often not a condition that you are

4    symptomatic of in early childhood -- could be, but in the main

5    you don't typically manifest the symptoms when you're five,

6    when you're ten?

7    A.  So schizophrenia can happen throughout the life cycle, and

8    it can certainly happen in childhood and it can certainly

9    happen in advanced age.  So that would be my answer.

10   Q.  So it is something that somebody could develop or start

11   manifesting symptoms at different points in their life?

12   A.  You would develop schizophrenia at any point in your life,

13   and then once you have it, you always have it.

14   Q.  Mr. Marmolejos was first diagnosed by Dr. Arroyo, as we

15   talked about, in February of 2016?

16   A.  Right.  After one visit, yes.

17   Q.  And per Dr. Arroyo's examination and notes, Mr. Marmolejos

18   had not previously before February of 2016 been diagnosed with

19   any mental illness?

20   A.  I would need to refer to the exhibit, but what I remember

21   from the notes is that he didn't have any past -- well, I think

22   what I remember from the note is that he didn't have any past

23   interaction -- he didn't report any past interaction with

24   mental health providers.

25   Q.  And also that he didn't report any past hospitalizations,

1    psychiatric or --

2    A.   I don't remember.  I don't remember whether he reported

3    that or not.  Certainly when I met with him, he denied having

4    any mental health problems.

5    Q.   You know what, I don't even think we need to go back to

6    Dr. Arroyo.  I think in your own report on page 7, you indicate

7    that Mr. Marmolejos could not remember whether he'd been

8    hospitalized psychiatrically.  He denied any history of suicide

9    attempt, alcohol or drug use, and the notes from Dr. Arroyo do

10   not indicate any history of alcohol -- hospitalization or past

11   psychiatric treatment.  And that's in your report page 7.

12   A.   OK.  I would request though if I could have the exhibit

13   just to refresh my own recollection.

14   Q.   This is Defense -- sorry -- Government Exhibit 2.

15   A.   Thank you so much.  I'm sure you read it accurately.  I

16   would appreciate having the exhibit, but you can go on.

17            THE COURT:  Actually, I have a question, so if you

18   could get to page 7, that would be helpful.

19            THE WITNESS:  Sure.

20            THE COURT:  Under past psychiatric history, it says

21   the notes of Dr. Arroyo do not indicate any history

22   hospitalization or past psychiatric treatment, correct?

23            THE WITNESS:  Correct.

24            THE COURT:  What notes are you referring to there?

25            THE WITNESS:  So I'm referring to the intake note and

1    the subsequent notes.

2              THE COURT:  Subsequent notes that were admitted as

3    Defense Exhibit 7?

4              THE WITNESS:  Correct.

5              THE COURT:  But you testified earlier that you

6    neglected to include those in the list of sources on page 2.

7    Is that correct?

8              THE WITNESS:  Yes.  And going through all the emails,

9    the correspondence, in the end when I was synthesizing my

10   sources, I must have simply forgot to include that in the list

11   of sources.

12             THE COURT:  When you say that it doesn't indicate any

13   past psychiatric treatment, do those notes not reflect

14   psychiatric treatment from 2016 to 2018?

15             THE WITNESS:  It's referring to treatment prior to his

16   treatment with Dr. Arroyo.

17             THE COURT:  I see.

18             THE WITNESS:  In other words, Dr. Arroyo doesn't

19   reference any previous treatment prior to his interaction with

20   Mr. Marmolejos.

21             THE COURT:  Understood.  Thank you.

22   BY MS. WILLIS:

23   Q.  And so you were not aware of when Mr. Marmolejos developed

24   schizophrenia -- you're not aware of when he developed

25   schizophrenia?

J43QMAR2                    Cohen - Cross

1   A.   Could you repeat the question?

2   Q.   Because the only treatment Mr. Marmolejos has is from 2016

3   forward, and as of 2016 he presented, and Dr. Arroyo diagnosed

4   him with schizophrenia.  Yes?

5   A.   I'm not sure what -- maybe we can break it down.  It seems

6   like there is more than one question.

7   Q.   Sure.  The first psychiatric treatment that we know of

8   Mr. Marmolejos having was in 2016.

9   A.   Yes.

10  Q.   And so that's the first time that we know of that he'd been

11  diagnosed with any mental illness?

12  A.   Yes.

13  Q.   In 2016, he would have been about 25 years old?

14  A.   OK.

15  Q.   Yes?

16  A.   I mean, I would have to do the calculation, but OK.

17  Q.   So you do not know when he developed schizophrenia and when

18  he started manifesting symptoms of schizophrenia?

19  A.   Well, I said that I don't concede that he has

20  schizophrenia, so I certainly I wouldn't say that I know when

21  he developed it.  I think it's still an open question what his

22  diagnosis is.

23          THE COURT:  Let me clarify on that front.

24          I certainly understood that that was your testimony

25  earlier, but to confirm, is it your testimony that he does not

1    have schizophrenia or simply that you don't have enough data to

2    support a diagnosis one way or another?

3              THE WITNESS:  I think that the work that he has done

4    with Dr. Arroyo is not dispositive of schizophrenia.  That

5    would be my first opinion.

6              And my second opinion would be that based on the

7    record that I reviewed and my interaction with Mr. Marmolejos,

8    I think it's unlikely that he has schizophrenia.

9              THE COURT:  Just if you could summarize the basis for

10    that portion your opinion.  Could you do that again?

11              THE WITNESS:  Sure.  Well, I think that the

12    hallucinations that are reported are not classic for

13    schizophrenia.

14              THE COURT:  In what way?

15              THE WITNESS:  So, typically the hallucinations that

16    someone has with schizophrenia is hearing more than one voice

17    that are conversing with each other and talking negatively

18    about the patient.

19              Hearing the voice of a deceased person is not typical

20    with schizophrenia.  That's typical with the kind of

21    hallucinations that many people have.  So a large swathe of the

22    population will have an auditory experience over the course of

23    their lifetime.  Probably up to 20 percent may at certain

24    points have auditory hallucinations.  It's very common to hear

25    someone call your name or hear a deceased person call your

1   name.

2          For example, for instance, it's very common in

3   grieving to have the deceased person call your name, so I view

4   that as relatively weak evidence that he has a disease like

5   schizophrenia.

6          In addition, the report of his suspiciousness towards

7   others, there are many conditions that would lead you to be

8   suspicious towards others, but that does not rise to the level

9   of a delusion.  When we talk about a delusion, we're talking

10  about an organized system of belief, which is a fixed false

11  belief.

12         So, for example, when someone believes that the mafia

13  is following them, and they see evidence of that everywhere

14  they go, that's the level of delusion that you would see in

15  schizophrenia.

16         So him being suspicious of others could be indicative

17  of a variety of things, some of which may be mental health in

18  nature and some of which may be not.  After all, he had been

19  arrested, and that might predispose someone to feel suspicious

20  in the environment or less at ease in the environment.

21         So, again, I don't think that the evidence here for me

22  is convincing that he has schizophrenia.  He is reporting some

23  symptoms and some of those symptoms predate his arrest, and so

24  I think, you know, that those would need further investigation,

25  but he's not presenting in a way that would be classic for

1    schizophrenia.

2            THE COURT:  All right.  One last question.  And I will

3    let Ms. Willis resume.

4            I certainly understood your testimony that in your

5    opinion Dr. Arroyo's diagnosis was, I think, precipitous is the

6    word you've used a couple of times insofar as it was based on

7    the one examination on February 1, 2016.

8            Now, I haven't looked fully through the records that

9    are admitted as Defense Exhibit 7, but to the extent that they

10   reflect treatment from Dr. Arroyo on dates thereafter, would

11   that in your opinion not give him a basis to confirm or refute

12   the initial diagnosis?  In other words, at this point his

13   diagnosis is not based only on the February 1, 2016 encounter.

14   It's presumably based on his history?

15           THE WITNESS:  Fair enough.  So when I review this

16   record, the notes are very sparse.  There's very little

17   narrative.  A lot of it is just checking boxes.  The boxes in

18   and of themselves are not particularly revealing.

19           For example, in the note that Ms. Willis reviewed from

20   I believe September 2019 where it said that his condition had

21   deteriorated, people's condition tends to deteriorate when

22   they're involved in a serious legal matter, and just checking

23   that box does not give me a whole lot of detail about what the

24   quality and nature of his deterioration was.

25           For example, he may have had an adjustment disorder,

1    which is probably the most common condition that someone has

2    when they're faced with legal stress.

3           And then the other concern that I have is what I

4    alluded to earlier, which is reflected both in the medication

5    record and in the notes, is that this is three years of

6    treatment and this is a pretty thin record for three years of

7    treatment with someone who purportedly has severe

8    schizophrenia.

9           So -- and, in addition, I would say that a dose of

10   Seroquel 150 milligrams is a very low dose of Seroquel for

11   someone who has schizophrenia.  Even the increased dosage that

12   happened later on to 300 milligrams is still quite a low dose.

13   So these are simply things that lead me to conclude that he

14   doesn't have a clear bona fide history of schizophrenia.

15           THE COURT:  Thank you.  Ms. Willis.

16   BY MS. WILLIS:

17   Q.  Let me start with one of the comments that you just made.

18   You said that his condition could have been deteriorating in

19   September of 2018 perhaps because he was facing a, you know,

20   serious criminal case?

21   A.  That could be a reason.

22   Q.  In the records that you have that are Defense Exhibit 7,

23   there are other medication management reports from Dr. Arroyo,

24   correct?

25   A.  Correct.

1    Q.  So the first one that we were discussing was the one

2    closest in time to your evaluation of him, which was the

3    September 19, 2018.  Yes?

4    A.  Right.  That was the one I just mentioned.

5    Q.  If we turn past the nine pages of the September 19, 2018

6    report, there follows a June 7, 2018 medication management

7    progress note that also says 1 of 9?

8    A.  OK.  Yes.

9    Q.  And June 7 of 2018 would have been also after

10   Mr. Marmolejos had been arrested?

11   A.  Right.

12   Q.  After he was facing a serious criminal case?

13   A.  Right.

14   Q.  And on page 3 of 9 of that particular report, June 7, 2018,

15   psychiatric condition -- and this is in the middle of page 3 --

16   "psychiatric condition is generally" on this report it says

17   "unchanged."

18   A.  Could you just direct me?

19   Q.  It's almost the exact middle of the page.  There's a box in

20   the middle of the page and beneath it, it says, "psychiatric

21   condition is generally."

22          THE COURT:  I think you're looking at page 1.

23   Q.  Page 3 of 9.

24   A.  So you're on page 3 of 9 now.  Well, again, I think these

25   boxes are not particularly helpful.  I think the narrative on

1   page 1 is helpful.

2   Q.  First I'm just asking, it does say that his psychiatric

3   condition is unchanged.  That's the box that is checked?

4   A.  That is the box that was checked, yes.

5   Q.  On page 2 of that same report, page 2 of 9, for affect, it

6   is not listed as "blunted" as it was on the previous report.

7   Instead, it is listed as "appropriate," correct?

8   A.  Right, which doesn't comport with schizophrenia for him to

9   have an appropriate affect at that time.

10  Q.  On page 2 of that report, higher up on the page, rapport is

11  not listed as "distant" as it was listed on the September

12  report; it's listed as "appropriate"?

13  A.  Again, inconsistent with schizophrenia.

14  Q.  Inconsistent with someone who is being symptomatic with

15  schizophrenia.  Yes?

16  A.  No.  Inconsistent with schizophrenia.

17  Q.  On the same page, page 2, under speech, the speech is

18  listed as just "coherent," but the box for "soft" is not

19  checked?

20  A.  Right.  In other words, he gives him a normal exam for the

21  most part.

22  Q.  Now, you stated here today that you basically conclusively

23  do not believe that he has schizophrenia?

24  A.  I did not say that.  I said that I think it's unlikely.

25  Q.  That it's unlikely?

1    A.  Yes.

2    Q.  Your report does not indicate that it is unlikely that he

3    has schizophrenia, just that his presentation is inconsistent

4    in your opinion with mental illness, correct?

5    A.  No.  I can read it --

6          THE COURT:  Dr. Cohen, do you mind moving a little

7    closer to the microphone?

8    A.  Yes.

9    Q.  Let's turn to page 13 of your report.  In your report, page

10   13, in the final paragraph, you say that:  "There's

11   inconsistencies in how Mr. Marmolejos is presenting."  And then

12   about two sentences into that last paragraph, you say, "This

13   does not necessarily imply that Mr. Marmolejos does not have

14   mental illness or intellectual disability."

15   A.  Well, I think that it's important to take my report in its

16   totality, and what I write is that it should be noted that the

17   present examination does not support a diagnosis of

18   schizophrenia or PTSD.  So, again, what I'm saying is that I

19   had an individual who was non-cooperative with the interview,

20   who was tendentious during the interview and selective in

21   answering his questions, which is not consistent with

22   schizophrenia, not consistent with a true intellectual

23   disability.  Therefore, it does not allow me to support either

24   of those diagnoses, and leads me to think that they are

25   unlikely, but I do not come down with finality about whether or

1  not he has schizophrenia in this report.

2  Q.  To clarify, you also don't say "it is unlikely" in the

3  report.  You say that it should be noted that the examination

4  doesn't support, but that is different than "it is unlikely,"

5  Right?

6  A.  To me "does not support" is definitely throwing a lot of

7  doubt on the diagnosis.  That's pretty strong language.

8  Q.  You also note in the same paragraph that "frequently, it is

9  particularly persons with mental illness and intellectual

10  disability who malinger or exaggerate their symptoms"?

11  A.  I do state that.

12  Q.  And then second to last sentence, you indicate that

13  "Mr. Marmolejos may have intellectual disability and mental

14  illness," and then you go on to say "but this evaluation found

15  him to be purposeful, intelligent and dignified and sort of

16  making his own choices"?

17  A.  Correct.

18  Q.  But you do acknowledge that he might have an intellectual

19  disability?

20  A.  Right, I say that he may have.  Again, I think we simply

21  don't have enough information to rule it out, but the

22  examination in and of itself indicated that those diagnoses

23  were not explanatory of his supposed inability to understand

24  his legal situation.

25  Q.  But so the analysis that you conducted and the tests that

1  you administered, as you said, were not enough to sort of

2  conclusively state yes or no in terms of intellectual

3  disability?

4  A.   Yeah, I would agree with -- let me back up for a second.

5  They were not enough to conclusively state whether he has

6  schizophrenia or intellectual disability.  I do think that it's

7  unlikely that he has schizophrenia, and if he does, it's

8  probably a mild form.  And I think that if he has intellectual

9  disability, the evidence that I gathered establishes a floor

10  for his intellectual disability.  In other words it's clearly

11  not profound given his relatively high level of functioning and

12  the rest of his life, and therefore it does not comport with

13  his supposed inability to say that two plus two is four and

14  things like that.  So he may have intellectual disability, but

15  I do think that I do rule out it being a profound such

16  disability, and I do state that in the report.

17          THE COURT:  You just testified that it's likely that

18  he has schizophrenia, but just a mild form.  Is that what you

19  said?

20          THE WITNESS:  No, I said that if he has it, I would

21  imagine it's a mild form because the symptoms that are detailed

22  in this record and the treatment that he has received don't

23  indicate a severe form of schizophrenia.  He is working.  All

24  the symptoms that were read out from the DSM are saying that

25  people with schizophrenia are so disabled, they can't work.

1    It's describing disability.

2              So if he's going to work and yet the symptoms in my

3    office were the result of his unremitting schizophrenia, it

4    doesn't comport -- it just doesn't comport.  Schizophrenia is a

5    global condition.  You don't just have it in the office and

6    then you don't have it when you go to work.  So those are my

7    concerns.

8              MS. WILLIS:  Just one moment, your Honor.  I'm sorry.

9              (Pause)

10   BY MS. WILLIS:

11   Q.  Malingering, as we discussed earlier, is specifically

12   intentional reporting of or exaggerating of symptoms for some

13   type of gain?

14   A.  That's true.

15   Q.  And is your opinion that Mr. Marmolejos was selective in

16   his answers in order to appear more ill than he is?

17   A.  Yes.

18   Q.  And it's your opinion that that was done so that he could

19   get some gain?

20   A.  Yeah.  In his mind, yes.

21   Q.  Would it change your opinion to know that if Mr. Marmolejos

22   is found not competent, he would be automatically remanded into

23   custody, he would then be psychiatrically hospitalized, and

24   could be held essentially for an indefinite amount of time?

25   A.  What I was stating is that it's not in my mind that I think

1    it's beneficial for him to be found incompetent or competent,

2    but it's often the case of criminal defendants who are under

3    pressure that they come to take a position of just not

4    understanding what the legal process is, and in their mind it's

5    a kind of defensive maneuver in the face of the situation that

6    they're in.  But I'm not saying that it's the best way to go or

7    that it gives them a clear-cut benefit, but it's well attested

8    that this is a common situation that happens with criminal

9    defendants.

10   Q.  Now, it's based on this sort of selectivity and your belief

11   that he's malingering --

12   A.  Well, it's based on the inconsistency and selectivity and

13   all the collateral sources and his performance, his very

14   inconsistent performance on cognitive testing.  So I didn't

15   rely on any one source of information, which is why I met with

16   him twice for four hours.

17   Q.  And, actually, this reminds me of something I meant to ask

18   you earlier.

19        When you finished the second meeting with him on

20   December 17 of 2018, you told his partner, Tanya Fleet, who was

21   there, that you wanted to meet with him a third time, correct?

22   A.  I said that if I would like to meet with him again, I would

23   be in touch with them, but this may be the last meeting that we

24   were going to have.

25   Q.  You had initially told myself and Assistant U.S. Attorney

1   Krouse that you anticipated having your report finalized by

2   January 2, correct?

3   A.   That may be the case.

4   Q.   And then when Assistant U.S. Attorney Krouse followed up in

5   February 11 --

6        (Pause)

7   Q.   When he contacted you regarding the status of your report

8   on February 11, 2019, you responded on February 12, 2019 that

9   the report would be forthcoming, and that due to the complexity

10  of this matter it took additional time to complete your report?

11  A.   Yes, I remember notifying yourself and Mr. Krouse of that

12  status update.

13  Q.   Now, I just want to be clear.  The specific questions that

14  you asked to assess if Mr. Marmolejos understood the nature of

15  the proceedings, the roles of the players, he did not answer

16  those questions correctly?

17  A.   He refused to answer them.

18  Q.   OK.  So he gave no answer to those questions?

19  A.   Yes.  Gave no answers or evasive.

20  Q.   So he did not express an understanding of the charges

21  against him?

22  A.   He did not express it, no.  Verbally, he did not verbally

23  express it.

24  Q.   He did not express that he understood the roles of the

25  court actors?

1    A.   No, he did not verbally express that as well.

2    Q.   He expressed it in some way that was not verbal?

3    A.   Well, I think that the totality of the situation that he's

4    in my office, you know, pretending that he doesn't know that

5    two plus two is four, is expressing some understanding of being

6    in legal jeopardy, but, no, he would not express any

7    understanding of the legal process verbally to me, and would

8    really not engage in a discussion of the legal process, which

9    was, again, highly unusual, in all kinds of ways.

10           For example, he told me that he watches a lot of TV.

11   So I asked him whether he watches -- whether he's ever seen a

12   cops-and-robbers television show, and he said that he had not,

13   which seemed to me odd since half of television is criminal

14   justice in nature.  So that's what I mean when I say that he

15   was either not answering or evasive.

16   Q.   He did not directly express to you verbally that he

17   understood his legal options in terms of trial, plea, however

18   he might resolve the case?

19   A.   No.

20   Q.   He did not express to you verbally that he understood the

21   role of his attorney?

22   A.   No.

23   Q.   And ability to --

24   A.   I would say he requested an attorney during his

25   questioning, and he told Dr. Fernandez that he knew he had an

1    attorney, but yes, for me, he did not express that.

2    Q.  So in the October meeting with you and the December 2018

3    meeting with you, he did not indicate that he understood the

4    role of an attorney?

5    A.  In fact, he said he didn't know who you were.

6    Q.  And ability to assist counsel is one of the prongs of

7    competence to stand trial?

8    A.  Ability.  Not choice, but ability, yes.

9    Q.  And so in assessing that, an important piece could be a

10   collateral interview with his attorney?

11   A.  Which was conducted.

12   Q.  But that could be an important piece, yes?

13   A.  It is a source of information, one source of information

14   but absolutely.

15   Q.  And as you indicated, we did have a conversation?

16   A.  We did.

17   Q.  And I believe in your report, you indicate that

18   conversation was about 30 minutes?

19   A.  Yes.

20   Q.  And you were aware that as of the time that we spoke, I had

21   been representing Mr. Marmolejos maybe from nine or ten months,

22   from January to our conversation in October?

23   A.  OK.

24   Q.  Is that correct?

25   A.  I would grant you that.  I don't know when he retained you

1   or when you were assigned to his case, but that's correct.

2   Q.  In the conversation, I told you I had represented him from

3   the beginning?

4   A.  OK.

5   Q.  And I told you that I had never had a moment where I felt

6   that he was understanding me?

7   A.  OK.

8   Q.  Yes?

9   A.  You did -- what I remember you saying is that "I can get

10  nothing from him.  He sits in my office and he stares."  Those

11  are some of the things I remember you saying.

12  Q.  Correct.  I also told you that when I would explain things

13  to him, he didn't appear to understand me?

14          MR. NESSIM:  Objection.  The attorney is testifying.

15          THE COURT:  No, I think she's asking him questions to

16  confirm with him things that she previously said.  It's a

17  little unusual, but to the extent he said an interview with

18  counsel is a collateral source, I think it's OK.  Overruled.

19  Q.  I told you that when I explained things to him, he didn't

20  appear to understand me?

21  A.  I don't remember your exact words, but yes, that was the

22  gist of what you communicated to me, that you were having a

23  hard time working with him, absolutely.

24  Q.  And that he never had sort of questions or follow-up for me

25  about anything we discussed?

1   A.  Again, I don't remember exactly what you said, but that was

2   certainly the gist, that he was not forthcoming with you.

3              THE COURT:  Ms. Willis, are we nearing the end?

4              MS. WILLIS:  We very much are, your Honor.  I'm

5   double-checking my notes to make sure I've hit everything, but

6   this is absolutely the penultimate moment.  One moment, your

7   Honor.

8              (Pause)

9              MS. WILLIS:  Your Honor, thank you for your

10  indulgence.  I have no other questions.

11             THE COURT:  Let me ask two questions before I turn to

12  the government if it has any redirect.

13             First of all, did you review any text messages that

14  were attributed to the defendant as part of your analysis?

15             THE WITNESS:  Well, I did review the text messages,

16  yes.

17             THE COURT:  When you say the "text messages," what are

18  you referring to?

19             THE WITNESS:  Well, I was provided with some text

20  messages by the government.

21             THE COURT:  OK.  Those don't appear to be listed in

22  your sources.  Did you rely on them in any way?

23             THE WITNESS:  So I did not include them in my sources

24  and did not rely on them specific -- did not rely on them

25  because when I spoke with defense counsel, she said that it's

1    not established that those were written by him.  So I felt that

2    as a forensic examiner, as a psychiatrist I'm not an

3    investigator, I wouldn't rely on those text messages.  I did

4    review them but I just decided to not refer to them or use them

5    as data for my report.  I relied on the data that I presented

6    in this report.

7            THE COURT:  To be clear, they played no role in your

8    analysis?

9            THE WITNESS:  They played no role in my analysis.

10            THE COURT:  And then I think one could presumably say

11    that over the course of a criminal case, that the tension can

12    wax and wane itself.  That is to say, as you get closer to

13    trial, judgment day, if you will, that presumably the stress

14    might increase.  Is that a fair assumption?

15            THE WITNESS:  Absolutely.  And it can sometimes wax

16    and wane in a way that might not be apparent to outside

17    observers.  In other words, there may be a clear trigger like a

18    hearing that's coming up or maybe it's sinking in for the

19    person and they're starting to have distress even though the

20    case is moving very slowly and nothing is happening.  So

21    there's not always a clear trigger because I think that was one

22    of the questions.

23            THE COURT:  If someone was suffering from

24    schizophrenia or intellectual disability or PTSD, for that

25    matter, is that kind of stress something that could exacerbate

1    or change the symptoms that he or she is exhibiting?

2              THE WITNESS:  I do think that legal stress could

3    exacerbate symptoms of psychosis and it could exacerbate

4    symptoms of PTSD if it was chronic PTSD.  I don't think it

5    would exacerbate symptoms of intellectual disability, but --

6    yeah, so it could do that.

7              Again, in his case the difficulty was that that didn't

8    appear to be happening.  In other words, the data that was

9    presented to me and my review of records and talking to others

10   in evaluating him, he was not having worsening of psychosis

11   because the symptoms weren't consistent with that, but that was

12   definitely something I entertained in my thinking, was this

13   someone with PTSD and schizophrenia whose condition is

14   deteriorating psychiatrically, but I did not find the evidence

15   was consistent with that.

16             THE COURT:  And, succinctly, the reason that it wasn't

17   consistent with that, that is not consistent with worsening

18   psychosis was --

19             THE WITNESS:  He's still working.  I mean, he's still

20   going to work every day.  I spoke extensively with his social

21   worker.  He's working.  He's performing well.  He's not late.

22   There's been no negative feedback about him.  It's very hard to

23   think of someone with schizophrenia with such a severe illness

24   that's deteriorating in the face of stress and then not

25   manifest in other aspects of his life, particularly

1    vocationally.  So the person in my office would not be able to

2    do the things I'm told he is doing on a daily basis.  So that

3    was my conclusion.

4              THE COURT:  All right.  Any redirect?

5              MR. NESSIM:  Very briefly.

6    REDIRECT EXAMINATION

7    BY MR. NESSIM:

8    Q.  Dr. Cohen, Ms. Willis asked you questions about

9    schizophrenia, and you testified that you did not conclude

10   necessarily that the defendant is suffering from schizophrenia.

11   Do you remember those lines of questions?

12   A.  I do.

13   Q.  And you testified earlier that a person with schizophrenia

14   can be competent to stand trial.  Is that right?

15   A.  Yes, I did.  In fact, I think I said the majority of people

16   with schizophrenia are competent to stand trial.

17   Q.  And is your conclusion -- and your basis for making that

18   statement is what?

19   A.  Is research and also clinical experience.  Individuals

20   with -- and you know I can -- there's extensive research, but,

21   for example, competency broadly has been studied in-depth in

22   schizophrenia because one question that comes up a lot is can

23   someone with schizophrenia consent to medical treatment.

24   That's a much more common competency question than even a

25   criminal justice setting.  So there's been a lot of research

1    into that area, for example, of competency, and what it shows

2    is that the vast majority of people with schizophrenia even

3    when they're very symptomatic they're able to understand issues

4    that relate to medical competency.

5            And the same is true in the criminal justice system,

6    that even if you are having delusions or are paranoid or

7    hearing voices, that does not mean that you don't cognitively

8    understand that you've been arrested.  It doesn't prevent you

9    from remembering you've been arrested, that there's a judge and

10   what the role of a judge is.  In fact, there are so many

11   instances in which people with schizophrenia show an acute

12   awareness of that.

13           For example, when they have court ordered treatment,

14   there's a lot of research evidence to show that that has

15   tremendous effect on someone having schizophrenia just having a

16   court order.  So there's a lot of data to support that people

17   with schizophrenia by and large are able to interact in the

18   criminal justice system, they have a good understanding, and

19   that they meet the criteria for legal competency.

20   Q.  It's your conclusion that Mr. Marmolejos is competent to

21   stand trial?

22   A.  That's my primary conclusion, and to my mind whether he has

23   schizophrenia is a side issue.  Whether or not he has it, I

24   still find him to be competent.

25   Q.  And you made that competency determination with the

1   understanding that Mr. Marmolejos had previously been diagnosed

2   by others with schizophrenia?

3   A.  Yes, I did.

4           MR. NESSIM:  One moment, your Honor?

5           (Pause)

6           MR. NESSIM:  Nothing further.

7           THE COURT:  Can we dispense with recross, Ms. Willis?

8           MR. FLOOD:  May we have a brief moment, your Honor?

9           THE COURT:  Brief moment.

10          MS. WILLIS:  No questions, your Honor.

11          THE COURT:  Thank you very much, Dr. Cohen.

12  Appreciate your service.  Why don't you step down.

13          (Witness excused)

14          THE COURT:  Mr. Nessim, I understand you have no

15  further questions, correct?

16          MR. NESSIM:  That's correct, your Honor.

17          THE COURT:  Ms. Willis.

18          MS. WILLIS:  Defense calls Dr. Edward Fernandez.

19   EDWARD FERNANDEZ,

20      called as a witness by the Defendant,

21      having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MS. WILLIS:

24          DEPUTY CLERK:  Please state your full name and spell

25  it slowly for the record.

1          THE WITNESS:  Edward Fernandez.  E-D-W-A-R-D;

2     F-E-R-N-A-N-D-E-Z.

3          MS. WILLIS:  Your Honor, I apologize.

4     Q.  Dr. Fernandez, good afternoon.

5     A.  Good afternoon.

6     Q.  What do you do for a living?

7     A.  Excuse me?

8     Q.  What do you do for a living?

9     A.  I'm currently a forensic psychologist, so I currently

10    consult with an organization called EAC where I provide

11    evaluations directly in court, different courts, Brooklyn

12    Veterans Court, Queens Mental Health Court and in Bronx Court,

13    Supreme Court.  And I also have a private practice that's

14    forensic in nature.

15    Q.  So currently you're working both as a consultant with EAC,

16    which I'll ask you some more questions about, as well as in a

17    private practice?

18    A.  Correct.

19    Q.  Before we get into the specifics, how long have you been in

20    the field of psychology?

21    A.  Over ten years in the field.

22    Q.  How long have you been in your current role with EAC?

23    A.  Current, about two years, but prior to that I was a

24    clinical director of their program in Queens, so there was

25    another two years that I was there.

1   Q.  And how long have you had your private practice?

2   A.  Since being licensed, so I believe 2012.

3   Q.  What degrees do you hold?

4   A.  I have a bachelor's degree in psychology based human

5   relation.  I have a master's in clinical psychology with an

6   emphasis on substance abuse.  And then I have another master's

7   in psychology, and then a doctorate degree in clinical

8   psychology.

9   Q.  And your degree in clinical psychology, was there a

10  particular emphasis to that degree?

11  A.  Multicultural.

12  Q.  What does that mean?

13  A.  So one of the areas in psychology that has been found to be

14  lacking and that was addressed by the APA, the American

15  Psychological Association, was to make sure that people going

16  through training are being - how do I put it - culturally

17  humble, making sure that culture is a part of everything they

18  do in terms of their clinical work.

19  Q.  Do you hold any professional licenses?

20  A.  Yes.  I'm a New York State licensed clinical psychologist.

21  Q.  Now, you spoke a little bit earlier about your work with

22  EAC.  Specifically, what is that organization?  What do they

23  do?

24  A.  They do many things, but where I came into play was being,

25  again, the clinical director and now a consultant.  The details

1    are essentially clients in different counties are referred by

2    the district attorney's office with suspicion of possible

3    mental health conditions, severe mental illness as is a

4    criteria to be part of the program.

5            And essentially after a brief screening and general

6    questionnaire, once a client is referred to our organization,

7    then I will conduct a clinical interview, which is a thorough

8    interview with record review, collateral information,

9    interviews with doctors, standard forensic evaluation and a

10   determination of diagnosis that also includes something called

11   a violence risk assessment to see whether or not a client is

12   either a low, moderate or high risk for violence in the

13   community.

14           And then I render an opinion about what best form of

15   treatment to be offered in order to address the client's

16   symptoms in the community so that their risk for recidivism is

17   lowered.  I make that determination and I still do it in a

18   consultant role, just not in a clinical director position.  And

19   we have meetings with the judges in the respective court parts,

20   the district court attorney --

21   Q.  Let me slow you down a moment.

22   A.  Sure.

23   Q.  You said you evaluate, diagnose, and come up with treatment

24   recommendations?

25   A.  Correct.

1    Q.  And then you said you sort of offer an opinion about that.

2    How is that opinion offered?  Is it an oral report?  Is it a

3    written report?

4    A.  No, all reports are written reports.

5    Q.  Who is that report then provided to?  You said that a

6    district attorney refers someone to you.  Who does the final

7    report go to?

8    A.  It goes to the judge and the court part -- their defense

9    and the ADA, the district attorney's office.

10   Q.  Now, you said that your report then goes to this group of

11   people, and you were starting to describe what then happens

12   next with the patient and with the report.

13   A.  In terms of once a determination of whether or not they --

14   so the whole process is that -- this is a choice.  It's an

15   alternative to incarceration.  So the client then will have the

16   choice of whether or not to participate or agree with the

17   treatment plan as stipulated in the report.

18        Once that's done, they plead guilty, and then we

19   monitor or the program monitors their adherence to the

20   treatment.  And, of course, with the course of severe mental

21   illness, it's not always a straight line.  So there are times

22   when the symptoms can become exacerbated, and that's the role

23   of the clinical psychologist in the director position to make

24   determinations as to adjustment to the treatment plan.

25   Q.  Now, the treatment plan that's formulated, is that

1    something that the court, the district attorney, the defense

2    attorney, and you are discussing or formulating together, or

3    how does that piece work?

4    A.   Not formulating together.  That is a recommendation done by

5    myself -- of course with support from my team, but that is my

6    recommendation.  And because I am coming from the perspective

7    of lowering recidivism and lowering risk for violence, and if

8    it is not accepted, then they are not a part of our program.

9    They can go and do another alternative to incarceration.  But

10   typically the treatment plan is developed by me with input and

11   with support, but ultimately the decision rests with me.

12   Q.   You discussed that if the person is accepted into the

13   program and pleads guilty, that then there is some sort of

14   ongoing monitoring by the program.  Does that ongoing

15   monitoring by EAC include ongoing interactions with the court

16   or is the just EAC and the clients?

17   A.   Correct, it's weekly meetings with the client, open access

18   to the psychologist, and monthly meetings in court where

19   there's an update provided depending on the severity of the

20   mental illness.  So there are times it might be weekly or might

21   be biweekly but typically monthly.  So there's constant

22   communication with the client in order to monitor the course of

23   their illness and their adherence to the program.

24   Q.   Does EAC -- are they working for the district attorney?

25   Are they working for the defense?  Are they working for the

1    Court?

2    A.   Neither.  It's a neutral party, and we're just a monitoring

3    organization.

4    Q.   You said that you had worked both as a consultant with EAC

5    and that you also were a director -- the clinical director at

6    the program.  Were your duties different when you were the

7    clinical director?

8    A.   I don't have the ultimate, ultimate say now, although the

9    clinical directors will follow what I say typically.  But in

10   the clinical director role I oversaw staff of about ten people

11   and would also present in court to testify if I needed to and

12   work with everybody directly.

13        In the consultant role, I evaluate clients and make my

14   recommendations which I then discuss with the current clinical

15   directors.

16   Q.   Can you describe a little bit about what your work entails

17   in your private practice?

18   A.   So the private practice is predominantly forensic in

19   nature.  So there are cases such as these, cases in immigration

20   court and through the City, through the counties, different

21   counties, so those are typically cases that I'm working on.

22   Q.   Prior to your work with EAC, were you employed as a

23   psychologist?

24   A.   Yes.

25   Q.   What was that employment?

1   A.  I worked in a city hospital, Lincoln Medical and Mental

2   Health Center for about five years.  I worked on their

3   outpatient psychiatry department.  And I also held multiple

4   roles; consultation liaison, working on the inpatient units.

5   There were just many different hats I wore during my assisting

6   with the training, but different roles.  I was at -- my title

7   was Psychologist Level II, which is a supervising psychologist.

8   Q.  When you say supervising psychologist, who were you

9   supervising?

10  A.  Psychologist Level I, so people that would require

11  licensure to work, to get their license or degrees and

12  supervisees, externs, doctor-level externs, master-level

13  externs.

14  Q.  In the context of career, have you diagnosed people with

15  mental illness?

16  A.  That's been my career.

17  Q.  How many people would you say you've diagnosed with mental

18  illness?

19  A.  That's something I -- that's a very difficult question to

20  answer.  I've been practicing for about ten years, so it has to

21  be at least between 600 something -- has to be over 500, I know

22  that.

23  Q.  In the context of your career, have you administered

24  cognitive tests?

25  A.  Yes.

1    Q.  How often would you say you do that?

2    A.  Well, so there's two parts to that question.  There is the

3    training aspect.  So no psychologist can administer tests --

4    you cannot administer intellectual tests without having formal

5    training in it, so that's part of your training as a doctoral

6    student.  And then afterwards, supervision by a licensed

7    psychologist in just how to administer tests in general.

8          So it's been a part of my practice since I started the

9    practice, once I was licensed in 2012, but I've had extensive

10   practice and supervision throughout my training.

11   Q.  Have you ever taught in the area of clinical or forensic

12   psychology?

13   A.  Yes, I've maintained, from being in a doctoral program

14   where I was teaching assessments, which is the intellectual

15   assessment, personality assessment, and doing other classes.

16   And then when I started my career, I also taught in a graduate

17   program at Hunter College where I taught multiple classes, but

18   the main class that I taught for about three to four years is

19   measurements and appraisals, which is about testing

20   psychological assessment.  And I've taught -- but I've

21   continued teaching throughout my career.  I think I've had only

22   about one or two semesters in the ten years where I did not

23   teach.

24   Q.  Are you still on the faculty of any institution currently?

25   A.  Yes.

1    Q.   Where is that?

2    A.   York College.

3    Q.   What specific classes or subject area are you --

4    A.   Social psychology.

5    Q.   What does that entail?

6    A.   Just how groups of people interact with other groups of

7    people.  That's a basic, a basic...

8    Q.  Are you a member of any professional organizations?

9    A.   I believe sometimes these memberships lapse, but I believe

10   I'm a member of the New York State Forensic Psychological

11   Association.

12   Q.   Have you done any research in the area of forensic or

13   clinical psychologist?

14   A.   No published research.  Our research was done in-house to

15   provide our staff better ways to work with their clients.  I've

16   done trainings at EAC, at Hunter, at John Jay during

17   presentations, yes, different areas.

18            MS. WILLIS:  Just one moment, your Honor.

19            Your Honor, I would offer Dr. Fernandez in the area of

20   forensic clinical psychology.

21            THE COURT:  Any objection?

22            MR. NESSIM:  No, your Honor.

23            THE COURT:  He is so received.

24            MS. WILLIS:  Your Honor, I would request permission

25   for Dr. Fernandez to refer to his -- well, I'll lay a

1    foundation.  Your Honor, if I can approach?

2              THE COURT:  You may.

3              MS. WILLIS:  Thank you.

4    Q.  First, I'm handing you what's been marked as Defense

5    Exhibit 8 for identification.  Do you recognize what I've

6    handed you?

7    A.  Yes.

8    Q.  What is it?

9    A.  This is a report on Mr. Marmolejos, my first report with

10   him.

11   Q.  You say first report.  Did you do more than one?

12   A.  The addendum to this report regarding his competency to

13   stand trial.

14   Q.  Did that report that you're looking at right now, Defense

15   Exhibit 8, did it contain an opinion on competence to stand

16   trial?

17   A.  No.

18   Q.  When was that report authored?

19   A.  Which?  The --

20   Q.  The report that you have in your hand, Defense Exhibit 8

21   when was that authored?

22   A.  The date of the report, April 17, 2018.

23   Q.  I'm handing you what I've marked as Defense Exhibit 9 for

24   identification.

25   A.  Thank you.

1    Q.  Do you recognize what I've handed you?

2    A.  Yes.

3    Q.  What is that?

4    A.  This is the addendum to the report with Mr. Marmolejos.

5    Q.  What is the date of that addendum?

6    A.  The date of this addendum was October 1, 2018.

7    Q.  In that report, is that the report where you discuss

8    competence?

9    A.  Yes.

10   Q.  In your evaluation and your report for October 1, Defense

11   Exhibit 9, did you utilize or incorporate your data and your

12   report from April 12?

13   A.  Yes.

14   Q.  And do those reports reflect your evaluation process, the

15   data sets that you referenced and your opinion about

16   Mr. Marmolejos's competence?

17   A.  Yes.

18          MS. WILLIS:  Your Honor, I would seek to move Defense

19   Exhibit 8 and 9 into evidence.

20          THE COURT:  Any objection?

21          MR. NESSIM:  No objection.

22          THE COURT:  Admitted.

23          (Defendant's Exhibits 8 and 9 received in evidence)

24          MS. WILLIS:  Your Honor, I would request permission

25   for Dr. Fernandez to be able to refer to his ports as needed

1    during testimony.

2              THE COURT:  That's fine.

3              MS. WILLIS:  Thank you.

4    Q.  Now, Dr. Fernandez, were you asked to evaluate German

5    Marmolejos?

6    A.  Was I asked?

7    Q.  Yes.

8    A.  Yes.

9    Q.  Do you see Mr. Marmolejos in court today?

10   A.  Yes.

11   Q.  Can you point to him and identify an item of clothing that

12   he's wearing.

13   A.  He's sitting in the last row, and he is wearing a black

14   sweater with a blue collar, it seems, with headphones.

15             THE COURT:  Indicating the defendant.

16             MS. WILLIS:  Thank you, your Honor.

17   Q.  As part of your evaluation with Mr. Marmolejos, did you

18   have in-person meetings with him?

19   A.  Yes.

20   Q.  What were the dates of those meetings?

21   A.  Referring to my report, there were three.  For the first

22   evaluation, it was March 22, 2018, then March 29, 2018, and

23   then the second report I met with him on September 20, 2018.

24   Q.  And do you recall the duration of those meetings with

25   Mr. Marmolejos?

J43QMAR2                          Fernandez - Direct

1    A.   The duration -- I do recall that the first, the first,

2    first evaluation that I had.

3    Q.   To clarify, that would be March 22?

4    A.   Correct, yes, March 22 was longer than expected.  Two to

5    three hours, I would say, much longer than expected.

6              The second meeting on the 29th, I would say between

7    one and two hours, and again, much longer than expected for

8    performance on the tests that he was administered on that day.

9              And then on September 20 I would say between one and

10   two hours.

11   Q.   Now, your meetings with Mr. Marmolejos, where did they take

12   place?

13   A.   The Federal Defenders office.

14   Q.   Were you in an office with a desk and a computer or were

15   you in a conference room?

16   A.   Conference room for -- yes, for three of the -- yes, all

17   three.  Private, free from distractions.  There was no -- I

18   found it an adequate place to give an evaluation.

19   Q.   Now, when you are conducting an evaluation of someone for

20   forensic purposes, what are the steps to that evaluation

21   process?

22   A.   OK.  The -- typically, once I've received a referral, any

23   supportive documentation, any kind of collateral information I

24   can have, such as medical records, psychiatric records,

25   collateral contacts that might be available to me, those are

1    things I want to collect.

2            I typically will not review in too much detail prior

3    to meeting with the client because I don't want to be biased in

4    terms of what I see in front of me, but sometimes I will review

5    it prior.

6            And then a thorough clinical interview with the

7    client.  Sometimes, depending on the presentation that the

8    client has, I might come up with more clinical questions that

9    then are followed up for confirmation with testing.  Other

10   times testing is already started off from the beginning, in

11   terms of that's the referral question.  But all of that is

12   taken into consideration.  So, again, the report is generated

13   based on multiple sources of information.

14   Q.  You talked earlier about how you had a focus or

15   concentration in multiculturalism.  Can you explain how

16   language or culture can play a role in the evaluation process?

17   A.  Sure.  Well, first of all, even just beginning an

18   evaluation, one of the basic, basic steps to psychotherapy or

19   to psychological evaluation is to develop a rapport.  If you

20   don't have rapport with the client, you cannot get an accurate

21   representation of their abilities.  So sometimes the evaluation

22   can take longer than usual, where you have to set a side your

23   check list of information you want to get and really just allow

24   the client to become more relaxed, more open and more genuine.

25   Q.  Let me just stop you for a moment.  I want to get back to

1    culture and language.  But first, since you've mentioned

2    rapport, you said sometimes you have to sort of wait on the

3    questions you have to establish this rapport.  What are your

4    techniques or what do you do to establish rapport with someone

5    you're evaluating?

6    A.  So, there are general ways that you can begin the

7    evaluation process like going right into your confidentiality

8    and doing things of that nature.  There are other ways where

9    you can just ask if the client is comfortable, see if they like

10   a glass of water, see how their day is going, just ways to be

11   informal with a client in order to allow them to be more

12   relaxed and more engaged.

13           You did ask about the multicultural part though.  Just

14   to address that as well.  Approaching clients in a language

15   that they understand, but also with terminologies and words

16   that they understand is very important.  Doing an evaluation

17   that is free of jargon, providing feedback, validating their

18   experience.  These are all techniques that are done in order to

19   develop a rapport so you can have the most accurate

20   representation of their abilities.

21   Q.  When you say "approaching clients in a language that they

22   understand," is it your understanding that Mr. Marmolejos

23   speaks English or Spanish?

24   A.  I believe -- his preferred language is Spanish -- not I

25   believe.  His preferred language is Spanish.

1   Q.  And are you a fluent Spanish speaker?

2   A.  Yes, I'm a native Spanish speaker.

3   Q.  Your three interviews with Mr. Marmolejos, March 22,

4   March 29, September 20 of last year, did you have an

5   interpreter present for those interviews or were you doing the

6   interview a loan in Spanish?

7   A.  I did the interview alone in Spanish.

8   Q.  Now, let's focus first on your first meeting with

9   Mr. Marmolejos on March 22.  How did he present to you when he

10  arrived for the evaluation?

11  A.  Sure.  Mr. Marmolejos is someone that's difficult to

12  forget.  I remember when I first met him that he seemed to be

13  asleep or tired, at least in the waiting room.  I didn't know

14  that that was the client I was going to be meeting with.

15          When he entered the room, he was predominantly

16  distant, bloodshot-type eyes, seemed pretty tired, spoke with

17  whispers really.  He engaged very minimally.  He engaged but he

18  spoke very low.

19          One thing that was pronounced, which I believe also

20  contributed to the testing part, was the amount of time that it

21  took for him to make responses.  So that sometimes, as I've

22  heard before, can be referred to as elusive.  It really looked

23  like he was processing each individual question that I was

24  asking and taking time to respond even if it was a one-word

25  response.

1     He remained logical.  I mean, he remained engaged in

2  the interview, but it certainly took longer than most typical

3  interviews that I'm accustomed to.

4     THE COURT:  Can I interrupt for a second so we can

5  talk about scheduling issues?

6     Since I mentioned, I have a proceeding coming up.  How

7  much longer do you have on direct with Dr. Fernandez?

8     MS. WILLIS:  At least an hour, your Honor.

9     THE COURT:  Here is my problem:  I have a sentencing

10  and then a plea, and I doubt that I would be free until the

11  earliest 4:15, 4:30.  It seems to me more prudent to adjourn

12  for the day and pick up another day.

13     The problem is that I don't really have much time

14  tomorrow or Friday.  So I could pick up sometime next week when

15  my schedule is a lot more open.  So can we do that and maybe

16  resume -- I hear Mr. Flood saying Tuesday.

17     MR. KROUSE:  Your Honor, I'm not in town on Monday or

18  Tuesday, and I would prefer to be here if possible.

19     THE COURT:  So how about Wednesday?

20     MS. WILLIS:  Wednesday is fine.  That's fine.

21     MR. NESSIM:  Wednesday afternoon, would you would be

22  available?  I have something in the morning.

23     MS. WILLIS:  Dr. Fernandez?

24     THE WITNESS:  I'll make it work.

25     THE COURT:  You're all being very picky here.

J43QMAR2                    Fernandez - Direct

1          THE WITNESS:  You are saying Wednesday afternoon?

2     Sorry to interrupt.

3          THE COURT:  Hold on one second.  You think another

4     hour, hour and half?  What I don't want to do is schedule this

5     for an afternoon and then not finish that afternoon.  So if I

6     were to schedule it Wednesday at 2:00 p.m., do we think that we

7     would get it in?

8          MR. NESSIM:  Could you do Thursday, your Honor?  It

9     seems like that might be better.

10          THE COURT:  I can do Thursday morning, yes.

11          THE WITNESS:  I'm not -- we will figure it out.  We

12     will figure it out.

13          THE COURT:  I'm being pretty accommodating here.  I

14     think I get to tell you when we're doing it, and you all have

15     to adjust.

16          MS. WILLIS:  We will, yes.

17          THE COURT:  Thursday morning?

18          MS. WILLIS:  Thursday morning.

19          THE COURT:  10:00 a.m.?

20          MS. WILLIS:  Yes.

21          MR. NESSIM:  Yes.

22          THE COURT:  Very good.

23          Now, I apologize, Dr. Fernandez, if that

24     inconveniences you, but I'd appreciate if you can adjust things

25     to be here.  Since you're not on cross-examination, you are

1    allowed to communicate with Ms. Willis and Mr. Flood if you

2    wish between now and then.

3            But please be here next Thursday promptly at

4    10:00 a.m. with Dr. Fernandez on the stand and ready to go, and

5    we will resume at that time.

6            Anything else, counsel?

7            MR. KROUSE:  No, your Honor.

8            MR. NESSIM:  No, your Honor.

9            MS. WILLIS:  No, your Honor thank you.

10           THE COURT:  Thank you very much.

11           (Hearing adjourned to April 11, 2019 at 10:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              INDEX OF EXAMINATION

2    Examination of:                        Page

3    DAVID GONZALEZ

4    Direct By Mr. Krouse . . . . . . .5

5    Cross By Ms. Willis . . . . . . 12

6    Redirect Mr. Krouse . . . . . . 18

7    ZIV COHEN

8    Direct By Mr. Nessim . . . . . . 19

9    Cross By Ms. Willis . . . . . . 60

10   Redirect By Mr. Nessim . . . . .144

11    EDWARD FERNANDEZ

12   Direct By Ms. Willis . . . . . .146

13              GOVERNMENT EXHIBITS

14   Exhibit No.                       Received

15   1  . . . . . . . . . . . . . . . . . . 7

16   1A    . . . . . . . . . . . . . . . . 8

17   3502A  . . . . . . . . . . . . . . . .18

18   2 . . . . . . . . . . . . . . . . . .28

19              DEFENDANT EXHIBITS

20   Exhibit No.                       Received

21   1  . . . . . . . . . . . . . . . . . .77

22   2 and 3  . . . . . . . . . . . . . . .80

23   4 and 5  . . . . . . . . . . . . . . .86

24   6 . . . . . . . . . . . . . . . . . .91

25   7 . . . . . . . . . . . . . . . . . .93

8 and 9 . . . . . . . . . . . . . . . . . . 157